[Crim. No. 23254. May 19, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES RICHARD ODLE, Defendant and Appellant.

388

**COUNSEL**

Jonathan Matthew Purver, under appointment by the Supreme Court, for Defendant and Appellant.

Eric S. Multhaup as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edward P. O'Brien and John H. Sugiyama, Assistant Attorneys General, Herbert F. Wilkinson and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant James Richard Odle was convicted of the first degree murder of Rena Aguilar, and the first degree murder of Floyd "Bernie" Swartz. The jury found defendant personally used a deadly and dangerous weapon (a knife) in the Aguilar murder, and that he personally used a firearm in the Swartz murder. With respect to the Aguilar murder, the jury found true one multiple-murder special circumstance (Pen. Code, § 190.2, subd. (a)(3)[1]); with respect to the Swartz murder, it found true three special circumstances: murder of a peace officer (§ 190.2, subd. (a)(7)), murder to avoid arrest (§ 190.2, subd. (a)(5)), and multiple murder (§ 190.2, subd. (a)(3)). The jury also convicted defendant of three counts of assault with a deadly weapon on a peace officer (§ 245, subd. (b)), and found that he personally used a firearm in committing the offenses. In addition, defendant was convicted of possessing a sawed-off rifle (§ 12020, subd. (a)), and three counts of automobile theft (Veh. Code, § 10851). He was sentenced to death for the murders. This automatic appeal arises under the 1978 death penalty law. We affirm.

### I. FACTS

In April 1980 Kathy Flannery and Rena Aguilar lived in Flannery's house in the City of Pinole. Flannery had known defendant for about 15 years and had been "seeing" him before he was sentenced to state prison. After his parole in October 1979, defendant was a frequent visitor at the Flannery home.

Defendant told Flannery he wanted a van or a truck to visit someone in Oregon. Thereafter, Flannery noticed a van parked across the street from her house. She told Aguilar she thought the van was stolen. Defendant was later identified as the man who had taken the van from a Richmond used car lot on the pretense of taking a test drive.

On the day of Aguilar's murder, defendant, his nephew, Bryan Odle, and William Moran, a friend of the Odle family, left San Pablo in defendant's

---

[1] All further statutory citations are to this code unless otherwise indicated.

1968 Chevrolet Impala. They spent the next eight hours driving around northwestern Contra Costa County, stopping periodically to buy and consume 6 six-packs of beer. Defendant was driving and did not drink as much as Moran and Bryan. Around noon, each of the three took one "hit" of LSD, but were unaffected by the drug. Moran and Bryan split the remainder of the drug after lunch, but still felt no effect. About 5 p.m., the trio drove to where the stolen van was parked across the street from Flannery's house, parked defendant's Chevrolet and left in the van. Soon thereafter defendant stopped at a gas station in Pinole and made a telephone call. When he returned to the vehicle, he said he "wanted to kill that bitch," or that he was "going to kill that bitch." Neither Moran nor Bryan asked defendant what he meant.

The group next met an acquaintance, Jessie Raymond, who joined the peripatetic beer drinking party. The four men eventually drove to Berkeley and made a sauna and hot tub appointment for later that night. They then drove to the Berkeley waterfront. When a fight erupted between Moran and Raymond, Bryan broke a table in the van. Defendant screamed, "This may be a stolen van, but it's my . . . van." The foursome proceeded to the Albany bowl, where Raymond left the group. At some point during the afternoon, Raymond heard defendant say that an unidentified "girl" knew that he had taken the van and that "he was going to talk to her about it or something."

After Raymond left, the trio went to their sauna and hot tub appointment. While driving back to Pinole between 10:30 and 11 p.m., Moran told defendant he was "stupid," and was "going to end up back in prison." Defendant struck Moran with the back of his hand and brought the van to a stop. Moran jumped out and hid in some bushes on the side of the road. Defendant yelled: "If you snitch or say anything I am going to kill you . . . ." Defendant and Bryan drove around for 25 minutes looking for Moran. Finally they stopped at a gas station. Bryan testified defendant left the van and talked to Flannery, who was at the gas station sitting in her car. When defendant returned to the van he said, "I have to be at Kathy's at 11:30 for a phone call."

Defendant and Bryan drove to Flannery's house. Defendant, holding a tire iron, entered the house through the unlocked front door, with Bryan following. While defendant stood in the hallway, the telephone rang, and Aguilar left her bedroom to answer the telephone. Bryan saw defendant strike her twice in the head with the tire iron as Aguilar screamed and tried to cover herself. Bryan left the house because the scene "turned [his] stomach." As he was leaving, Bryan heard defendant say: "This is what you get,

bitch, for snitching." After five to ten minutes, Bryan walked back into the house and saw defendant choking Aguilar. He again left the house.

A short time later, defendant walked outside and told Bryan to back the van up to the porch, and handed him the keys. Defendant carried Aguilar out wrapped in a blue quilt and put her in the van. Bryan saw what he thought to be a large pool of blood at Aguilar's head. He also saw that she was still breathing. Bryan told defendant to "put her out of her misery." Defendant then hit her "a couple more times."

Bryan refused to ride in the van. Defendant went inside the house and got the keys to Aguilar's car and gave them to Bryan. Bryan drove away in Aguilar's car, but soon realized defendant was not following him, and stopped at a stop sign. Defendant then pulled up quickly in the van and screamed to Bryan, ordering him to get in the van. Bryan entered the van and the two men drove away. Aguilar was no longer in the van. Bryan testified that defendant "was in a rage. He was saying, 'The bitch wouldn't die. The bitch wouldn't die.' He just kept repeating it as in disbelief saying, 'I stabbed her and I stabbed her and the bitch wouldn't die.'"

Several residents of the area had seen the van drive down the street. Dale Dacon heard "squealing" tires, followed five seconds later by a man yelling, and then, five to ten seconds later, she heard a woman "scream[ing] a high pitched scream." At her window she saw a van "slowly stopping and going down our street . . . ." Sylvan Amdahl heard the squeal of brakes in the front of his house. He then heard a woman cry out in a loud and "terrified" voice, "Help me, someone please help me." Lea Wallace, her daughter Alyce, and her son-in-law, Donald Hightower, also saw the van drive by. Alyce described a "shrill scream"; she heard, "Oh, no. Oh, oh, no." Donald ran to the street and found Aguilar partially propped up against a stack of newspapers on the front porch of a house. An ambulance was called and Aguilar was taken to a nearby hospital where she died of "multiple traumatic injuries" just after 2 a.m.

The autopsy showed Aguilar's injuries to be of three major types: stab wounds to the chest, stab wounds to the abdomen and wounds to the head and surface of the brain consistent with being beaten with a blunt object. The wounds to the abdomen were about three inches deep, some penetrating to the back muscles. There were also injuries to the neck consistent with being choked by the gold chain that was found around the victim's neck. Some injuries could have been caused by falling or jumping out of a moving vehicle onto asphalt, and others on the hands and forearms were self-defense wounds.

Defendant and Bryan left the area in the van. Meanwhile, Pinole Police Officer Hodges had been called to the area because of the screams and the screeching tires. He encountered the van and gave chase. The van stopped suddenly on Merritt Avenue and its two occupants fled on foot. Guy Odle (defendant's nephew and Bryan's brother) lived on Merritt Avenue with his wife Michele. Defendant appeared at their house sometime after 1 a.m. He closed the curtains and asked for a shirt. He told Michele he had strangled and hit someone with a tire iron, but that she would not die. He said he tried to kill her because she was a snitch.

Defendant left the house after about 15 minutes and went to the home of Patricia Hart, Michele Odle's mother. Cleona Bennett, a friend of the Odle family, lived with Ms. Hart. Bryan was already at the Hart house when defendant arrived sometime between 1 and 1:45 a.m. Bennett heard defendant tell Bryan that he killed Aguilar because she was going to "snitch him off about the van." Bennett heard defendant say he wanted to get Bill Moran for the same reason.

The next day defendant went back to Guy and Michele Odle's house. Bill Moran went to the house that day and heard defendant telling Guy, Michele and a third person that he kept stabbing Aguilar but that she would not die. Moran testified defendant "was kind of laughing about it . . . ." Michele Odle advised Moran "under her breath" that he had better leave. Moran feared defendant, and spent the next several days in various hotels until defendant was captured.

Defendant wrote two notes the day after the murder. Although he tore up the first note, it was later reconstructed. The first note read: "I James Richard Odle, I done the crime early this morning alone, no one helped me, no one did nothing to me. I am a Loner, & a Rebel, I James R. Odle signed this." The second note read: "I James Richard Odle, I stole the '76 Chevy van by myself, no one else even knew it was stolen. I also did the crime done early this morning alone, no help, no nothing. No one knew anything i did, i am a, Rebel & a Loner, & no one even knows what i am doing, or even done. I James Richard Odle wrote this, In case something happens # I am gone—Find Me Punk—."

Two days after the murder, defendant stole a 1966 Ford pickup truck and drove to an area near Nevada City in the Sierra Nevada foothills. He stayed in a mobile home on land owned by Kathy Flannery's uncle. The Crumrines lived on an adjacent parcel. Defendant traded a stereo to Gerald Crumrine for a 7-millimeter German Mauser deer rifle. At the time of the trade, the rifle had a full-sized barrel.

The next day, defendant returned to the Bay Area. About 4 p.m. he stopped and robbed a Sierra Milk Store in Roseville.[2] That night, defendant was seen in San Pablo driving a different stolen truck. He told Billy Hart, Patricia Hart's son, and Billy's friend, Mark Casey, that he had a "sawed-off Mauser," and showed them a rifle with a short barrel. As defendant showed them the rifle he said, "They ain't going to take me alive."

On the third day after the Aguilar murder the Pinole police received an early morning report that defendant might be in the area driving a small pickup truck and armed with a sawed-off Mauser. The pickup was seen parked around the corner from Flannery's house in Pinole, the scene of the Aguilar murder. The police rendered the truck inoperable and put it under surveillance. Later that morning, Detective Peter Janke saw three males enter Flannery's home. He called for assistance and several officers searched the house. While the officers searched the house, defendant entered the truck and coasted it down the hill. Officers Donald Donohue and Floyd Swartz discovered the parked truck, and a nearby resident told them that a few minutes earlier his dog had "barked like hell." The two officers went into the man's backyard and climbed over the fence. Donohue found some freshly trampled grass leading down a slope to a creek. He followed the path and crossed the creek into an unfenced backyard on the opposite bank. There he found defendant squatting in some bushes at the end of a wooden fence and holding a sawed-off rifle.

Defendant saw Donohue and slightly shifted his position. Donohue used a nearby tree for cover and drew his revolver. He yelled to Swartz that he had found defendant. Swartz radioed that news to other officers and joined Donohue, taking a position behind some pampas grass to Donohue's left. Several other officers arrived and took positions behind Donohue and Swartz. All of the officers were in uniform.

Donohue tried to convince defendant to surrender, and kept up a steady discussion. Defendant responded that he "wasn't coming out and . . . wasn't going back to prison." Donohue told him he was surrounded and to give up his position. Defendant replied: "I sure picked a helluva place to hide." The dialogue went on for several minutes. Toward the end of this period, Swartz, who had previously been silent, yelled to defendant, "Come on, man, give it up," and made other similar pleas. At this point the officers behind Donohue and Swartz left to cut off possible escape routes.

Donohue observed that Swartz was bent over and leaning around a bush, as if he were trying to get a better view of defendant. He then saw defendant

---

[2] The store clerk testified and identified defendant as the man who stopped at the store that afternoon. Evidence of the robbery itself was excluded in the guilt phase based on a defense objection.

stand, face Swartz's direction, and fire a single shot. Donohue then fired three shots at defendant. Swartz died of a single gunshot wound that entered the left side of the neck near the chest and exited out of the right side of the back.

After the Swartz shooting the area was secured and SWAT and canine teams called in. Several hours later, following another gun battle in which defendant fired at a number of officers, defendant surrendered. He had a slight bullet wound to the forearm.

The defense presented the following evidence: In a 1973 automobile accident defendant suffered a life-threatening blood clot on the left side of his brain and a skull fracture from ear to ear. Dr. Robert Blum, a specialist in neurological surgery at Contra Costa County Hospital, removed the clot and a three-by-three-by-four-inch cube of defendant's brain in a procedure described as a temporal lobe lobotomy. The whole visible portion of defendant's brain was bruised and the temporal lobe was lacerated.

Dr. Blum continued to treat defendant at the hospital clinic. Starting in December 1973, defendant reported he had headaches and trouble concentrating and was more emotional than before the operation. He also reported "spells of uncontrollable temper." He had beaten his wife and was afraid he was going to "murder" someone. Dr. Blum prescribed Thorazine and referred defendant to the psychiatric clinic.

Defendant stopped taking the medication and in January and February reported less severe bouts of anger and fewer headaches. In March he reported he occasionally lost control and went berserk. In July he was admitted to the psychiatric ward of the county hospital because he had gone berserk after becoming intoxicated with alcohol. Dr. Blum was uncertain whether defendant's actions were related to the brain injury. Defendant told him he had always been that way. In August defendant experienced fainting and falling spells, during which his lower limbs would shake. In September 1974, Dr. Blum inserted a plate over an opening that had been left during the earlier brain operation. Dr. Blum did not see defendant again after this second operation.

Dr. Leonti Thompson was Program Chief of the Contra Costa County Mental Health Program in 1973. Dr. Thompson testified that the temporal lobe aids in integrating and understanding complex ideas, and in giving order to behavioral responses. In Dr. Thompson's opinion, defendant suffered from an organic brain disorder. The behavioral disturbances of a person with this condition would be beyond his control. He also stated that "[n]ormal kinds of everyday stimuli" could trigger a completely

disproportionate reaction in such a person and that consumption of alcohol or narcotics could aggravate a temporal lobe disorder.

Defendant was admitted to the acute receiving psychiatric ward of Contra Costa County Hospital three times after the accident in 1973. He was combative, assaultive, agitated and disoriented for prolonged periods during his commitment. Defendant was committed again in 1974 after he had become violent and threatened himself and others. In 1975 he was again committed after he was found prowling in a backyard. He became violent when apprehended and was incoherent, speaking in unintelligible sentences and words. Throughout 1975 and 1976 defendant visited the Richmond outpatient clinic with the same symptoms of anger, rage and lack of impulse control. In 1976 he was diagnosed by a Department of Corrections physician as suffering from nonpsychotic organic brain syndrome with explosive personality.

Dr. Steven Holtz, a neurologist, testified that an electroencephalogram (EEG) performed in his office in 1982 showed two types of abnormality indicating an "epileptic seizure disorder." This disorder, he explained, could have affected defendant's behavior and caused an inability to control temper or rage. Dr. Holtz testified that an EEG taken in 1980 showing only a mild abnormality, and two normal EEGs taken in 1976, were not necessarily inconsistent because the disorder surfaced only during sleep, and the earlier EEGs did not indicate under what circumstances they were made.

Defendant's wife and several members of his family also testified to changes in his personality after the accident. They explained that before the injury he had been kind, gentle and responsible. The only exception was in 1971 when he shot a man in the buttocks after the victim and several other men had assaulted him. His family testified that after the automobile accident defendant became unpredictable, violent, and attempted suicide a number of times.

In rebuttal, Dr. Paul Berg testified that although defendant suffered from organic brain syndrome, there was no automatic relationship between that condition and criminal behavior. He testified there was no evidence of diminished capacity from any source regarding either of the two killings. Instead, Dr. Berg asserted defendant's behavior indicated he was able to think rationally, make choices and weigh his actions, and that defendant could be classified as a sociopath.

After the jury determined defendant's guilt, the following penalty phase evidence was presented: The prosecution offered evidence of other crimes by defendant. Additional evidence was received as to the 1971 incident in

which he shot a man in the buttocks after being assaulted; as a result of this incident he suffered a misdemeanor battery conviction. In 1972 defendant was convicted of first degree burglary of a commercial building while personally armed with a firearm. In 1976 he was convicted of robbery while armed with a firearm, and auto theft. In 1980 he committed a burglary and robbery, inflicting substantial injuries on his victim, who had not resisted. On the day of the Aguilar murder, he showed a pipe bomb to Bryan Odle and William Moran and stated that he planned to attach the bomb to the manifold of Flannery's husband's car, that it would blow up killing him, and that Flannery would collect insurance money. On the day before the Swartz murder, he robbed a Sierra Milk Store in Roseville using the sawed-off rifle.

The defense presented additional evidence about the change in defendant's personality after his 1973 accident. His nephew testified defendant and his wife took him in after family problems caused him to leave his home and that defendant was the only relative who agreed to care for him. The nephew also told of how after the accident and surgery defendant suffered blackout spells in which he would fall to the ground, and other episodes in which he became excited and acted wildly.

Defendant's employer testified that before his accident defendant was an excellent worker who got along well with his coemployees, that he and his wife invited defendant and his former wife to their home on numerous occasions, and that after the accident defendant changed considerably.

Defendant's former wife testified that he and their daughter, who was 13 years old at the time of trial, were very close, and that when in prison he would write to his daughter every day. Some of the letters were read into evidence.

The defense also presented evidence about the 1980 burglary and robbery. It was shown that defendant's fingerprints did not match any of the seven usable prints found at the burgled residence.

## II. GUILT PHASE ISSUES

### A. *Denial of Motion to Sever Murder Counts*

■ Defendant contends the court erred in denying his motion to sever the two murder counts. We disagree.

He concedes joinder was proper under section 954, because the offenses were connected in their commission and were of the same class.[3] He argues, however, that the court abused its discretion in refusing to sever the murder charges "in the interests of justice." (§ 954.)

When joinder is proper under section 954, a defendant "can predicate error only on a clear showing of prejudice." (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) As we observed in *Willams,* the first step in the analysis is to determine whether the evidence in each case would have been admissible in the other, because such cross-admissibility would ordinarily dispel any inference of prejudice. In this case, the People argue that evidence of the Aguilar murder would have been admissible to show motive in a separate prosecution for the murder of Swartz, and that evidence of the Swartz murder would have been admissible to show consciousness of guilt in a separate prosecution for the murder of Aguilar. Defendant concedes the admissibility of the Aguilar evidence in the Swartz case, but disputes the relevance of the Swartz murder[4] to any "contested fact" in the Aguilar murder case.[5]

We recently noted that "[e]vidence of escape is admissible to show consciousness of guilt [citation] and it is permissible to admit evidence of

[3] Section 954 provides: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count."

[4] He initially claims the People cannot assert consciousness of guilt as a possible ground for the admissibility of the Swartz evidence because that issue was not raised below and "this new theory of admissibility [cannot be raised] for the first time on appeal." Although defendant might be correct were we reviewing an evidentiary ruling, the purpose of determining whether evidence would have been admissible in a hypothetical separate trial is simply to evaluate the extent to which defendant may have been prejudiced by a denial of a motion to sever. Whether or not a particular theory of cross-admissibility was posited below is irrelevant.

[5] By referring to a "contested fact," defendant's argument implies that defense counsel's effective concession at trial of defendant's responsibility for the Aguilar murder would have made evidence of consciousness of guilt irrelevant. Nevertheless, "[w]e must evaluate motions for severance and objections to consolidation in light of the showings then made and the facts then known." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480].) At the time of the pretrial severance motion the defense position appeared to be that Bryan Odle or some third party was responsible for the Aguilar killing.

violence during escape [citation]. Such evidence shows all the facts attending the escape, to either increase or decrease the probative force of the escape. [Citation.] It should be acknowledged, however, that evidence of force and/or injury during an escape could easily have a prejudicial effect which outweighs any probative value." (*People* v. *Holt* (1984) 37 Cal.3d 436, 455, fn. 11 [208 Cal.Rptr. 547, 690 P.2d 1207].)

*Holt* makes clear that the trial court has broad discretion to exclude evidence of violence during an escape. ■ Thus, we cannot say definitively that the Swartz murder would have been admitted in a separate trial on the Aguilar charges. It is clear, however, that many of the circumstances surrounding the murder, including defendant's flight and resisting arrest, would have been admissible to show consciousness of guilt. Further, there is no dispute regarding the admissibility of the Aguilar murder in a separate prosecution for the Swartz murder. This substantial cross-admissibility alone may be enough to find no abuse of discretion in denial of defendant's severance motion.

Even assuming the Swartz murder would not have been admissible in a trial on the Aguilar murder, it would not follow that the court abused its discretion in denying severance. ■ " 'The judge's discretion in refusing severance is broader than his discretion in admitting evidence of uncharged offenses . . . .' [A] ruling on a motion to sever is based on a weighing of the probative value as against the prejudicial effect, but in the weighing process the beneficial results from joinder are added to the probative-value side. This requires the defendant to make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial." (*Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 138-139 [172 Cal.Rptr. 86]; *Williams, supra,* 36 Cal.3d 441, 451.)

In moving to sever the murder counts, the defense argued that joining the Swartz case with the Aguilar prosecution complicated certain tactical decisions in defending against the Aguilar charges. This was the only prejudicial effect of joinder cited by the defense in the trial court. Defendant's request for an in camera hearing to discuss the tactical complications was granted over prosecution objection, and an unrecorded in camera hearing was held. The next day the trial court denied the motion to sever.

■ Defendant now argues joinder of the murder counts undermined his diminished-capacity defense. He points out that the diminished-capacity evidence was introduced primarily in defense of the Aguilar charges and was not relevant to the Swartz murder. With respect to the Swartz killing, defense counsel argued that defendant simply shot in the direction of the

officer in order to draw fire and cover his escape. He asserts joinder made it difficult for the jury to distinguish between the separate defense theories.

We find no evidence in the record to support defendant's claim. The prosecutor never argued that defendant's conduct with regard to the Swartz murder somehow lessened the credibility of his diminished-capacity defense, nor did he in any way relate the Swartz murder to the defense theory on the Aguilar charges. In addition, defense counsel, on more than one occasion, advised the jury to view the offenses separately.

Defendant's diminished-capacity evidence was undermined, not by the joinder of offenses, but by the testimony of several witnesses suggesting that defendant had premeditated and planned the murder of Aguilar. All witnesses associating with defendant on the day of the murder testified that he was acting rationally and deliberately. This testimony was not contradicted by any defense witness. ■ "The burden of demonstrating that consolidation or denial of severance was a prejudicial abuse of discretion is upon him who asserts it; prejudice must be proved, and '[a] bald assertion of prejudice is not enough.'" (*Balderas, supra*, 41 Cal.3d 144, 171.) ■ We cannot say based on the assertion of prejudice made to the trial court that it abused its discretion in permitting a consolidated trial.

Although this was a pre-*Williams* trial, none of the remaining factors detailed in *Williams* for consideration in deciding a request for separate trials alters our view. This is not a case in which at least one and possibly two relatively weak charges were joined to support each other, raising the danger that the jury would aggregate the evidence to convict on both charges. (*Williams, supra*, 36 Cal.3d at p. 453.) The evidence of both crimes was overwhelming; indeed, defendant did not dispute at trial that he was responsible for the killings. Neither was this a case in which the joinder alone made defendant subject to the death penalty (*id.*, at p. 454), because the Swartz murder had its own special circumstances attached. Although the Aguilar murder was a particularly brutal and arguably inflammatory crime, this factor is not sufficient to find an abuse of discretion when there is substantial cross-admissibility and none of the other indications of prejudice is present.

B. *Instructions on Substitution of an Alternate Juror*

Shortly after the start of deliberations, it became necessary to replace a juror with an alternate juror, and both parties so stipulated. ■ In *People v. Collins* (1976) 17 Cal.3d 687, 694 [131 Cal.Rptr. 782, 552 P.2d 742], we interpreted Penal Code section 1089 to require that, in such situations "the court instruct the jury to set aside and disregard all past deliberations

and begin deliberating anew. The jury should be further advised that one of its members has been discharged and replaced with an alternate juror as provided by law; that the law grants to the People and to the defendant the right to a verdict reached only after full participation of the 12 jurors who ultimately return a verdict; that this right may only be assured if the jury begins deliberations again from the beginning; and that each remaining original juror must set aside and disregard the earlier deliberations as if they had not been had."

In this case, the court instructed as follows: "The court is compelled under the law to admonish you that you are to start your deliberations from scratch because, obviously, Mrs. McHenry [the alternate] has not had the benefit of whatever discussions you have had so far . . . . Start your discussions from scratch so that Mrs. McHenry has full benefit of everything that has gone on between the jury up to the present time."

By instructing the jury to "start from scratch," the court implied the jury should disregard previous deliberations. ■ By adding, however, that the jury should start from scratch "so that Mrs. McHenry has full benefit of everything that has gone on . . . up to the present time," the court implied that the jury should not disregard previous deliberations, but instead, start again in order to bring the new juror "up to speed" on what matters have already been discussed and possibly decided.

This interpretation would defeat the purpose of the *Collins* instruction, which intends to "insure that each of the 12 jurors reaching the verdict has fully participated in the deliberations . . . ." (*Collins, supra,* 17 Cal.3d at p. 694.) As we said in *Collins,* "The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. . . . Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations." (*Id.,* at p. 693.)

Assuming error, we find no prejudice. In *Griesel* v. *Dart Industries, Inc.* (1979) 23 Cal.3d 578, 585 [153 Cal.Rptr. 213, 591 P.2d 503], we observed that the closeness of the case and the comparison of time spent deliberating before and after the substitution of the alternate juror were factors to be considered when determining prejudice from *Collins* error. In *Griesel* we found the error prejudicial because the case was close and the jury had

deliberated for seven days before substitution, and rendered its verdict less than four hours after substitution. In *Collins* itself we found the error harmless because the case against the defendant was "very strong" and the jury had deliberated for little more than an hour before substitution was made, and returned a verdict after several additional hours of deliberation.

In this case the evidence against defendant was overwhelming; he conceded responsibility for the crimes and his diminished-capacity evidence was inconsistent with the evidence of his conduct on the day of the Aguilar murder. Furthermore, the jury had deliberated for only part of one afternoon before the alternate juror was substituted, and the newly constituted jury went on to deliberate for an additional two-and-one-half days before returning a verdict. Under these circumstances we find any error in the court's instructions harmless.

## C. *Defendant's Waiver of His Right to Be Present*

After the jury began its deliberations, the trial court, at defendant's request, allowed him to waive his right to be present in the courtroom for "questions that are handled without the jury coming back, that sort of thing . . . ." Later, pursuant to this agreement, defense counsel in defendant's absence agreed to allow the jury to review the transcript of a certain witness's testimony which it had requested. Still later, various arrangements were discussed in front of the jury without defendant being present. At that time, the trial court explained defendant's absence to the jury as the result of "an agreement . . . already put on the record to the effect that it would not be necessary for [defendant] to be here at this time." Defendant's counsel assented to this characterization of defendant's earlier waiver. The next day, defendant was present in court when various transcripts were supplied to the jury for its use in deliberations. The prosecution at that time requested a clarification of defendant's position with regard to this practice. Defendant responded by specifically waiving the requirement that any testimony requested by the jury be read back in open court, and consented to its being furnished properly screened copies of the transcript instead.

■ Defendant, citing federal authorities, now contends his right to have any testimony requested by the jury read back in his presence was not waivable, and that the court erred in permitting him to waive that right and in providing the jury with transcripts pursuant to that agreement. (*Diaz* v. *United States* (1912) 223 U.S. 442, 455 [56 L.Ed. 500, 505, 32 S.Ct. 250] [capital defendant incapable of waiving right to be present at every stage of trial]; *Bustamante* v. *Eyman* (9th Cir. 1972) 456 F.2d 269, 274 [capital defendant may not waive right to be present for replay of taped instruction to jury].) Furthermore, he asserts reversal is compelled because it cannot be

shown from the record that the "error" was harmless beyond a reasonable doubt. (*Blackwell* v. *Brewer* (8th Cir. 1977) 562 F.2d 596, 599-600; cf. *Bustamante, supra*, 456 F.2d at p. 275.)

We do not question defendant's right to be present for all proceedings that take place in the courtroom. He cites no controlling authority, however, for his contention that it is improper for a court, with the consent of the accused and his counsel, to provide a transcript to the jury in lieu of rereading testimony in open court.[6] We are unpersuaded that such a practice encroaches in any way on "the fullness of [defendant's] opportunity to defend" his case. (*Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 105-106 [78 L.Ed. 674, 678, 54 S.Ct. 330, 90 A.L.R. 575].) As such, defendant's waiver of his right to have requested testimony read back in his presence was entirely permissible.

The court did err in allowing *discussion* in the presence of the jury when defendant was absent.[7] At no time did defendant waive his right to be present in proceedings taking place before the jury. The error, however, was harmless. Defense counsel was present at all times and participated fully in the decisions about what materials the jury should receive; furthermore, defendant's absence was adequately explained to the jury such that no injurious inferences could have been drawn simply by the fact of his absence from the courtroom.[8]

### D. *Time Limitation on Voir Dire*

Defendant asserts the court imposed a 25-minute time limitation on his voir dire examination and, even though the limitation was not enforced, defense counsel was adversely affected because he felt forced to hurry his examination.

Defendant cites *People* v. *Hernandez* (1979) 94 Cal.App.3d 715 [156 Cal.Rptr. 572] for the proposition that "[a]lthough the trial judge has a

---

[6]Defendant relies on a Pennsylvania Supreme Court case, *Commonwealth* v. *Peterman* (1968) 430 Pa. 627 [244 A.2d 723], which stated in dicta, "if the trial court, at the request of the jury, *sends out* to the jury the testimony of any certain witness such would constitute reversible error. [Citation.]" (*Id.*, at p. 726, italics in original.) The decision, however, provides no rationale for this assertion.

[7]In addition to the episode referred to earlier, it also appears defendant was not present when the jury was dismissed at the end of each of the three days of its deliberations.

[8]The parties cite a good deal of California authority for their respective positions, but it is inapposite. The cases cited by the People are concerned variously with proceedings out of the presence of the jury, or do not involve capital trials, whereas defendant cites cases in which the trial court communicated with the jury without the knowledge or consent of the defendant or defendant's counsel.

duty to restrict the examination of the prospective jurors within reasonable bounds so as to expedite the trial (*People* v. *Dorsey* (1974) 43 Cal.App.3d 953, 966 [118 Cal.Rptr. 362]), the fixing of an arbitrary time limit for voir dire in advance of trial is dangerous and could lead to a reversal on appeal." (*Hernandez,* supra, 94 Cal.App.3d at p. 719, fn. omitted; see also § 1078.)

We have recently spoken strongly about the right to a fair and impartial jury. In *People* v. *Armendariz* (1984) 37 Cal.3d 573, 584 [209 Cal.Rptr. 664, 693 P.2d 243], we unanimously held that improper denial of counsel's request to use his peremptory challenges requires reversal: " 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' (*People* v. *Riggins* (1910) 159 Cal. 113, 120 [112 P. 862])."

Here, however, defendant has failed to show his voir dire time was restricted. Although the court had apparently informed counsel it would schedule a given number of prospective jurors to appear at the courthouse each day on the assumption that an individual examination would take 25 minutes, such a time limit was not enforced. In fact, the record shows examinations were approximately 40 minutes per juror. When it became apparent to the court that examinations were averaging more than 25 minutes, it asked counsel if this would continue. When counsel replied affirmatively, the court did not object, but instead rescheduled the appearance dates of prospective jurors "so that they don't have to come here and wait around."[9] We conclude that use of a 25-minute examination estimate as a scheduling tool did not prejudice defendant's right to a fair and impartial jury.

### E. *Conflict in Instructions*

At the request of both parties, the court instructed on the sufficiency of testimony of a single witness (CALJIC No. 2.27), and on the necessity that accomplice testimony be corroborated. (CALJIC No. 3.11.) ■■ Defendant now contends that with regard to the testimony of Bryan Odle the effect of the latter instruction was undermined by the former, resulting in prejudicial error.

We recently addressed this precise issue in *People* v. *Chavez* (1985) 39 Cal.3d 823 [218 Cal.Rptr. 49, 705 P.2d 372]. There we found that when, as

---

[9]During this conversation, defense counsel stated, "I am really concerned about the time constraints and the pressure the court is putting on me." Although this comment suggests defense counsel may have felt some pressure to hurry his examination, he was not asked to curtail voir dire nor was he threatened that his voir dire would be curtailed.

here, (i) CALJIC No. 3.11 was given, (ii) the jury was further instructed on the kind of evidence necessary to constitute corroboration, and to view an accomplice's testimony with distrust and (iii) the prosecution never urged the jury to accept the accomplice's testimony without corroboration, the jury was not misled and no prejudice resulted. (*Id.*, at p. 831.)[10] In this case, as in *Chavez,* we find no error.

### III. SPECIAL CIRCUMSTANCE ISSUES

Of the four special circumstance findings, defendant does not dispute that two (the finding of murder to avoid arrest and one finding of multiple murder) were proper. Either of these two unchallenged special circumstance findings is sufficient to render defendant eligible for the penalties of death or life in prison without possibility of parole. (§ 190.2, subd. (a).) Defendant challenges the second finding of multiple murder, and the finding of murder of a peace officer. To the extent either such finding cannot be upheld, it could not properly be considered at the penalty phase as a separate "aggravating factor" affecting the penalty choice under factor (a) of section 190.3 (sentencer shall consider in aggravation "any special circumstances found to be true"). (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 780 [230 Cal.Rptr. 667, 726 P.2d 113].)

### A. *"Excessive" Multiple-murder Special-circumstance Findings*

The multiple-murder special circumstance applies when a defendant in the present proceeding is convicted of more than one offense of murder in the first degree. (§ 190.2, subd. (a)(3).) ▇▇▇ The prosecution, however, may properly allege only one multiple-murder special circumstance, even though a capital defendant may be charged with two or more murders in that proceeding. (See *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn.).)

Here, defendant was charged with *two* multiple-murder special circumstances: the murder of Aguilar, defendant having also murdered Swartz, and the murder of Swartz, defendant having also murdered Aguilar. The jury found in accord with the charge. It should, instead, have found a single

---

[10] We held, however, that CALJIC No. 2.27, when given under such circumstances, "should" include an explicit reference to testimony requiring corroboration. (*Chavez, supra,* at pp. 831-832.)

Defendant attempts to distinguish *Chavez* because in that case the witness in question, unlike Bryan Odle, was not an accomplice as a matter of law. In *Chavez,* however, we specifically rejected the People's argument that the witness's questionable accomplice status should make any difference in our determination of whether there was error. (*Id.*, at p. 830.)

special circumstance of multiple murder. Consequently, one of the two multiple-murder special-circumstance findings must be vacated. (Accord, *Allen, supra*, 42 Cal.3d at p. 1273.)

B. *Murder of a Peace Officer*

Section 190.2, subdivision (a)(7) lists as a special circumstance: "The victim was a peace officer . . . who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties . . . ." ▮▮▮ Defendant claims it was error to omit instructions on the elements of this special circumstance.

The amended information alleged the special circumstance in the language of subdivision (a)(7), and included the charge that defendant knew or should have known Swartz was a peace officer engaged in the performance of his duty. The court, however, gave no instruction on the special circumstance. The jury found true "the Special Circumstance allegation that Defendant, James Richard Odle, intentionally killed Floyd Swartz, a peace officer engaged in the performance of his duty . . . . " The finding did not state whether defendant knew or should have known Swartz was a peace officer engaged in the performance of his duty. The Attorney General does not dispute this was error, but claims the special circumstance finding may nonetheless be upheld, because the error did not "prejudice" the jury's result on this issue.

At the outset, we must decide what standard of review applies to instructional error of this kind. In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], we concluded that failure to instruct on an element of a special circumstance under the 1978 death penalty law is federal constitutional error. We analogized such error to those in *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450] (instruction suggesting directed verdict or presumption relieving People of burden of proving every ingredient of offense beyond a reasonable doubt) and *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969] (conclusive presumption equivalent of directed verdict) and attempted to anticipate the test of prejudice the United States Supreme Court would adopt for this type of error. We concluded that indications from the high court suggested such error would be reversible per se in the absence of facts supporting application of one or more of four limited exceptions: (i) If the erroneous instruction was given in connection with an offense of which the defendant was acquitted and had no bearing on the offense of which he was convicted; (ii) If the defendant conceded the issue; (iii) If the factual issue

posed by the omitted instruction was necessarily resolved adversely to the defendant under other properly given instructions (the *"Sedeno"* exception (*People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913])); or (iv) If the parties realized the element was in issue, presented all the evidence at their command on the issue, and the record both established the existence of the element as a matter of law and showed the contrary evidence not worthy of consideration (the *"Cantrell-Thornton* exception" (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267])). (36 Cal.3d at pp. 554-556.)

The United States Supreme Court has yet to enunciate the test of reversible error when an element of an offense or special circumstance finding is omitted from instructions to the jury. The court has, however, recently shed light on these issues, and has held that some instructional errors of constitutional dimension may be found harmless by a reviewing court.

In the first of these cases, *Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689], the court made it clear that the decision whether a particular punishment is appropriate in a given case need not be made by a jury, and that Eighth Amendment-based limitations on the imposition of the death penalty are substantive limitations on sentencing that need not be enforced by a jury. Therefore, "[i]f a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution regardless of who makes the determination of the requisite culpability; by the same token, if a person sentenced to death lacks the requisite culpability, the Eighth Amendment violation can be adequately remedied by any court that has the power to find the facts and vacate the sentence." (*Id.,* at p. 386 [88 L.Ed.2d at pp. 716-717, 106 S.Ct. at p. 697].) As in *Garcia, supra,* 36 Cal.3d 539, the element in issue in *Bullock* was intent to kill. We see no basis for reaching a different conclusion with respect to the error at issue here however, because the degree of defendant's knowledge that a given victim is a peace officer in the performance of his duties is also an element that establishes the culpability requisite to imposition of the death penalty.[11] ■ *Bullock* therefore teaches that there is no right under Sixth or Eighth Amendments to the United States Constitution to have a jury determine the existence of all of the elements of a special circumstance.

*Bullock* also notes, however, the court's earlier decision in *Hicks* v. *Oklahoma* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227]. *Hicks* held that

[11] Under our state's procedure, the special circumstance findings are made at the close of the "guilt phase" trial, following a first degree murder verdict, rather than during the "penalty phase." (§ 190.1.) This difference has no constitutional significance. For purposes of this analysis the special circumstance finding is a sentencing issue.

if state law creates an entitlement to particular jury findings, "the Due Process Clause implies that appellate findings do not suffice to protect that entitlement." (*Id.*, at p. 387, fn. 4 [88 L.Ed.2d at p. 717, 106 S.Ct. at pp. 697-698].) ■ It has been suggested that *Hicks* requires reversal of a special circumstance if the jury did not necessarily find all of the elements. We disagree.

In *Hicks* the state law entitlement was to a jury determination of the *punishment to be imposed*. The jury in that case had imposed a mandatory 40-year term on the defendant who had been convicted of unlawfully distributing heroin and found to be an habitual offender. Thereafter the habitual offender statute had been declared unconstitutional. The appellate court nonetheless affirmed the sentence after concluding that the defendant had not been prejudiced by the mandate of the invalid statute because the sentence was within the range of otherwise permissible punishment for the underlying substantive offense. The high court held, "[w]here, . . . *a State has provided for the imposition of criminal punishment in the discretion of the trial jury,* it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion . . . and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State." (447 U.S. at p. 346 [65 L.Ed.2d at p. 180], italics added.) Because the jury had not determined the appropriate sentence and the appellate court had not itself reconsidered the appropriateness of the sentence, the Supreme Court held that the defendant had been deprived of his liberty without due process. In the present case no comparable deprivation occurred. Defendant's right to have a jury determination of the appropriate punishment was not curtailed in any way. Neither *Bullock* nor *Hicks,* therefore, requires that the "murder of a peace officer in the performance of his duties" special circumstance be set aside.

As we concluded in *Garcia, supra,* 36 Cal.3d 539, however, the facts to be found in determining a special circumstance allegation true are no less crucial than those to be found as elements of a crime. A special circumstance finding places the defendant in the category of persons eligible for the death penalty as opposed to a term of 25 years to life. A defendant's liberty interest in the accuracy of this finding, and in having it made by a jury, is no less when a special circumstance is in issue than in the determination of guilt. (*Garcia, supra,* 36 Cal.3d 539, 552.) In this respect the second recent decision of the United States Supreme Court, *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], is instructive.

*Rose* involved the determination of guilt, not a special circumstance finding. The error in instructions, like that considered earlier by the court in *Sandstrom, supra*, 442 U.S. 510, involved a presumption, this time a rebuttable presumption. The jury in a murder trial had been instructed that homicides were presumed to be malicious in the absence of evidence to rebut the implied presumption. After the Sixth Circuit Court of Appeals had affirmed a judgment granting habeas corpus relief on grounds that the presumption impermissibly shifted the burden of proof on the issue of malice, and could not be found harmless, the United States Supreme Court granted certiorari on the question of whether the harmless error analysis of the court of appeals was proper. Recognizing that not all constitutional errors require reversal of a criminal conviction, the court held that the instructional error was among those errors to which a harmless error analysis may be applied.

The court first pointed out that errors that are *not* subject to harmless-error analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] are the exception. "We have emphasized . . . that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [Citation.] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (*Rose, supra*, 478 U.S. at pp. 578-579 [92 L.Ed.2d at p. 471, 106 S.Ct. at pp. 3106-3107].)

The court confirmed that reversal is mandated if the error necessarily rendered the trial fundamentally unfair, if it aborted the basic trial process, or denied it altogether (*id.*, at p. 578 [92 L.Ed.2d at pp.470-471, 106 S.Ct. at p. 3106], and fn. 6), but analyzed the instructional error before it in terms of its potential impact on the actual trial. The court noted that in addition to the erroneous instruction creating a rebuttable presumption of malice the jury had been instructed that it had to find the defendant guilty beyond a reasonable doubt of every element of first and second degree murder, and although instructed to presume malice from predicate facts the jury must still have found the existence of the predicate facts. "In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause injury. [Citation.] In that event the erroneous instruction is simply superfluous: the jury has found . . . 'every fact necessary' to

establish every element of the offense beyond a reasonable doubt." (*Id.*, at p. 580 [92 L.Ed.2d at p. 472, 106 S.Ct. at p. 3108].) The court went on to counsel that "our harmless error cases do not turn on whether the defendant conceded the factual issue on which the error bore. Rather, we have held that '*Chapman* mandates consideration of the entire record prior to reversing a conviction for constitutional errors that may be harmless.' . . . The question is whether, 'on the whole record . . . the error . . . [is] harmless beyond a reasonable doubt.' " (*Id.*, at p. 583 [92 L.Ed.2d at p. 474, 106 S.Ct. at p. 3109].)

In an instructive footnote the court suggested that harmless-error analysis may be applied to other types of instructional error. "Harmless-error analysis addresses . . . [W]hat is to be done about a trial error that, in theory, may have altered the basis on which the jury decided the case, but in practice clearly had no effect on the outcome?" (*Id.*, at p. 582, fn. 11. [92 L.Ed.2d at p. 473, 106 S.Ct. at p. 3108])

Finally, and most recently, the court has squarely held that instructional error, even with regard to an element of an offense, may be tested under a harmless error standard. *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], was a criminal prosecution for sale of "obscene" materials. The jury was erroneously instructed that in determining "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value" (as required by *Miller* v. *California* (1973) 413 U.S. 15, 24 [37 L.Ed.2d 419, 431, 93 S.Ct. 2607]), the measure to be applied was how the material would be viewed by "ordinary adults in the whole state of Illinois." Although the United States Supreme Court agreed with the defendants that this latter statement was error, and that an objective standard was constitutionally required, it held that the error did not require reversal of the conviction if under the predicate facts found by the jury "no rational juror, if properly instructed, could find value in the magazines . . . ." (*Id.*, at p. 503 [95 L.Ed.2d at p. 447, 107 S.Ct. at p. 1922].) Stating the test otherwise, the court held there was "no reason to require a retrial if it can be said beyond a reasonable doubt that the jury's verdict . . . was not affected by the erroneous instructions." (*Ibid.*, [95 L.Ed.2d at p. 446].)[12]

We conclude, therefore (as we did in *People* v. *Lee* (1987) 43 Cal.3d 666, 674-676 [238 Cal.Rptr. 406, 738 P.2d 752], with respect to conflicting

---

[12]The court dismissed any suggestion that certain aspects of *Bullock,* supra, 474 U.S. 376 [86 L.Ed.2d 704, 106 S.Ct. 689], might appear contrary to its holding: "To the extent that cases prior to *Rose* [, *supra*, 478 U.S. 570 (92 L.Ed.2d 460, 106 S.Ct. 3101)] may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, see, e.g., *Cabana* v. *Bullock*, 474 U.S. 376, 384, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986), after *Rose,* they are no longer good authority." (*Pope, supra,* 481 U.S. at pp. 503-504, fn. 7 [95 L.Ed.2d at p. 447, 107 S.Ct. at p. 1922].)

instructions on an element of a substantive offense which may have resulted in removal of the issue from the jury's consideration), that a harmless-error analysis pursuant to *Chapman, supra,* 386 U.S. 18, is appropriate and constitutionally permissible.

A similar conclusion follows under provisions of the California Constitution: reversal is required only if prejudice results from the error. ▇ We have long recognized a defendant's due process right to have the jury determine every material issue presented by the evidence. (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].) In *Modesto,* and later in *People* v. *Sedeno, supra,* 10 Cal.3d 703, 720, we held that an error in failing to instruct on lesser included offenses could not be cured by examination of the record to assess whether it is reasonably probable that, correctly instructed, the jury would have convicted the defendant of the lesser offense. Subsequently, however, in *People v. Murtishaw* (1981) 29 Cal.3d 733, 765 [175 Cal.Rptr. 738, 631 P.2d 446], we applied a harmless-error analysis to erroneous instructions that failed to require the jury to find intent to kill as an element of attempted murder. Applying the test of prejudice enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]—whether it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error—we concluded that the error was not prejudicial. ▇ The *Watson* test conforms to and satisfies the command of article VI, section 13, of the California Constitution that "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (46 Cal.2d 818, 836.)

▇ Initially, we note that the first two elements of the special circumstance—that Swartz was a peace officer engaged in the performance of his duty—were expressly stipulated to by defense counsel. Additionally, the jury expressly found the third element, intentional killing, in the course of its other findings. After careful consideration, we conclude that failure to instruct the jury on the last element—that defendant "knew or reasonably should have known that his victim was a peace officer engaged in the performance of his duties"—was harmless beyond a reasonable doubt.

We note first that the jury was properly instructed on the closely related "murder to avoid lawful arrest" special circumstance. Thus, the verdict strongly implies that the jury found defendant knew or reasonably should have known that the murder victim (Swartz) was a peace officer performing his duties (i.e., attempting to arrest).

Most significantly, however, this is a case in which the facts overwhelmingly demonstrate that the instructional error was harmless. Even if it is accepted as a theoretical possibility that defendant murdered Swartz to avoid arrest but still did not know his victim was a peace officer in the performance of his duties, the circumstances of the murder make it impossible to conclude that such an assumed lack of knowledge would have been reasonable. After the Aguilar murder, defendant knew the police would be looking for him. In apparent anticipation of an encounter with the police, he obtained a rifle, sawed off part of its barrel and, showing it to Billy Hart and Mark Casey, told them, "They ain't going to take me alive." Later, while the police were searching for him in Flannery's home, defendant evidently fled through neighbors' yards and found a hiding place across the creek. Soon Officer Donohue found him, and attempted to persuade him to surrender. Swartz arrived and called for the other officers, who arrived shortly thereafter. All of the officers at the scene were in uniform. Defendant responded to Donohue, saying he "wasn't coming out and . . . wasn't going back to prison." At one point he stated, "I sure picked a helluva place to hide." Swartz, joining the effort to convince defendant to surrender, told defendant, "Give it up," "Come on, man, give it up," and "Give it up, throw the gun out." In our view, these circumstances show conclusively that, at a minimum, defendant reasonably should have known Swartz was a peace officer engaged in the performance of his duties. It would, indeed, require fantastic speculation on our part to hold that a reasonable jury could have found otherwise. We therefore conclude that the failure to instruct on the special circumstance was harmless under *Chapman*. It follows that it was also harmless under *Watson, supra,* 46 Cal.3d 818, 836.

■ Defendant also asserts the jury's special circumstance finding should be set aside because the finding did not state that defendant knew or should have known Swartz was a peace officer engaged in the performance of his duty. In *People* v. *Davenport* (1985) 41 Cal.3d 247, 273-275 [221 Cal.Rptr. 794, 710 P.2d 861], however, we held the special-finding requirement of section 190.4 is satisfied by a finding of the truth of the alleged special circumstance and that it is unnecessary to find the facts on which that determination is based. The jury here expressly found the truth of the special circumstance allegation. (See also *People* v. *Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251].)

Accordingly, the peace-officer special circumstance finding cannot be overturned. It was properly considered at the penalty phase as a factor in aggravation.

## IV. Penalty Phase Issues

### A. *Instructions on the Matters Subject to Consideration and Standards to be Applied*

The jury was instructed pursuant to former CALJIC No. 8.84.1 on the factors it was to consider in determining defendant's penalty, and was not given the "expanded factor (k)" instruction subsequently prescribed in *People v. Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813]. Defendant asserts the jury was thereby erroneously left with the understanding that his mental condition and character evidence was *irrelevant* to the sentencing decision. Similarly, the jury was instructed pursuant to former CALJIC No. 8.84.2 that it was to impose a sentence of death if it found aggravating circumstances outweighed mitigating circumstances. Defendant asserts the jury was thereby erroneously left with a misunderstanding about *the nature of the weighing process* called for under the statute, and its duty to determine, on the basis of each juror's individual judgment, whether death is the *appropriate* penalty under all the circumstances. (*People v. Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]; *Allen, supra*, 42 Cal.3d 1222, 1276-1277.)

### 1. *Factor (k)*

■ Viewing the matter in light of the evidence and arguments presented, we conclude a reasonable jury would not have been misled about its duty to consider defendant's mental condition and character evidence as mitigating factors in its penalty determination. First, the jury was plainly instructed to consider defendant's mental condition *at the time of the offenses* in determining penalty. (§ 190.3, factors (d) & (h); CALJIC No. 8.84.1.) Moreover, we believe the jury was left with the understanding that it was to consider defendant's mental condition *generally,* as well as his character and background, in determining penalty.

The court told the jury, "[you] were previously instructed in the guilt phase of this trial that sympathy or pity for a defendant should not influence your consideration of the evidence. In this, the penalty phase of the trial, the jury may properly consider sympathy or pity for the defendant in determining whether to show mercy and spare the defendant from execution." After reading to the jury the unadorned version of factor (k) (§ 190.3, factor (k)), the court defined mitigating circumstances as those that do not justify or excuse a crime, but which in "fairness" and in "mercy" may be considered as "extenuating or reducing the degree of moral culpability."

We believe the court's definition helped direct the jury's attention not to defendant's moral culpability regarding "the crime" alone, but instead invited it to consider evidence that "in fairness and mercy" decreased the moral blameworthiness ascribable to defendant.

Any doubt about whether the jury understood it was to consider defendant's general mental condition, as well as his character and history in determining penalty, is dispelled by both counsel's arguments. It is true, as defendant observes, that the prosecutor *once* suggested the jury's factor (k) inquiry was limited to determining whether defendant's evidence extenuated "the gravity of the crime."[13] In numerous other references, however, the prosecutor gave the jury the opposite (and correct) message that the jury should properly *consider* all of defendant's character and mental condition evidence,[14] but argued that, on the whole, the evidence on that point was not persuasive, or was entitled to little weight.[15] On the whole, we are satisfied that the prosecutor left the jury with a proper understanding of its authority to consider defendant's character and "mental condition" evidence as a mitigating circumstance under factor (k).

Even if we were to *assume* that *the prosecutor* left the jury with an "ambiguous" message about its consideration of defendant's evidence, in light of *defense counsel's* arguments, we would not conclude the jury was misled about its factor (k) inquiry. Explaining the jury's application of factor (k), defense counsel told the jury it had a "duty to . . . consider . . . *anything* that [it] feel[s] or an individual [juror] feels is appropriate. [¶] As an example: You are allowed to consider mitigation or extenuation . . . ." Counsel went on to preview the court's definition of mitigating circumstances, and stressed: "So the concept of mercy enters your deliberation [in the penalty phase although] . . . it does not in the guilt phase. [¶] In this

---

[13] Discussing the jury's consideration of factor (k), the prosecutor stated: "[I]s there anything about the crimes that you can think of—sit down and say to yourself I'm going to try to think of anything in [defendant's] favor regarding how he committed those crimes which are extenuating, and you won't be able to do it because there is nothing extenuating about those crimes."

[14] The prosecutor informed the jury, "[Y]ou are judges of defendant's character, his history, and what should be done with him. [¶] [Y]ou are entitled to feel pity for him, sympathy for him." Later he told the jury, "[T]he law is that *the jury may take into account sympathy factors for the defendant* because you are at the sentencing phase, *you are acting like the judge who looks at* the probation report, covers *the guy's entire background,* you are looking at his record, any *social factors,* and you are looking at *his mental workup,* and you are looking at the factors of the crime, and then you are deciding what should be done with this man. And that's what you are doing. So sympathy is part of it and *you would be wrong not to at least say we'll consider it.* [¶] . . . We are talking about Jim Odle, his *character, his background,* what he did." (Italics added.)

[15] This proper approach has been taken by prosecutors in previous cases. (See, e.g., *Allen, supra,* 42 Cal.3d at p. 1276.)

phase . . . the jury may properly consider sympathy or pity for a defendant in determining whether to show mercy and spare the defendant from execution. . . . [¶] So [under factor (k)] I'm not talking about excusing his conduct, I'm talking about considering his conduct and trying to make a determination whether there is an extenuating circumstance that is sufficient in your mind not to require him to be executed." Counsel then described defendant's life before his 1973 accident, and concluded that only after the accident and removal of a large part of his brain did defendant truly become a violent person.

Thereafter defense counsel argued the jury should consider defendant's mental condition generally (i.e., not only at the time of the offenses) in determining appropriate punishment: "[Y]ou must consider this: are you going to put to death a man *in this conditon*? [¶] [A]s of August 1973 [defendant] was not the same man he was before. And that is the person who you must decide whether he is or is not to be executed." After summarizing the various defense witnesses' testimony and concluding it established defendant's "redeeming value," he concluded his argument with a plea for a sentence of life without possibility of parole rather than death "[b]ecause *considering everything you have heard*" relating to his "humanity . . . in total [,] his life need not be taken. [¶] *There could be no mandate in justice or fairness to execute a man whose human capacities were altered when part of his brain was removed. [¶] The law envisions this kind of mitigating factor as one that must be given significant weight in the terrible decision whether a man is killed or allowed to live.*" (Italics added.)

We conclude the jury was not misled by the absence of an "expanded factor (k)" instruction, and that it was in fact left with the correct understanding that it was to consider defendant's mental condition, and his character, as mitigating factors in determining the appropriate penalty. (*Allen, supra*, 42 Cal.3d 1222, 1276; *Brown, supra*, 40 Cal.3d 512, 544, fn. 17; *California* v. *Brown, supra*, 479 U.S. at p. 547 [93 L.Ed.2d at pp. 943-944, 107 S.Ct. at p. 842] (O'Connor, J., conc.), *id.*, at pp. 547, 549-550 & 559-560 [93 L.Ed.2d at pp. 943-944, 945 & 951, 107 S.Ct. at pp. 842, 844 & 849] (Brennan, J., dis.) & *id.*, at pp. 561-563 [93 L.Ed.2d at pp. 952-953, 107 S.Ct. at pp. 850-851] (Blackmun, J., dis.).)

### 2. *Brown*

██ Based on the instructions and the arguments here, we conclude a reasonable jury would not have been misled contrary to our interpretation of the "weighing process" in *Brown, supra*, 40 Cal.3d 512. First, there is no reason to believe the jury was misled about the *nature* of the weighing process called for under former CALJIC No. 8.84.2. In addition to that

standard instruction, the court told the jury: "*In determining whether or not the aggravating circumstances outweigh the mitigating circumstances . . . you are not to simply count up the number of circumstances and decide whether there are more of one than the other. The final test is the relative weight of the circumstances not the relative number. [¶] One mitigating circumstance alone can be found by you to balance or outweigh any number of aggravating circumstances.*"[16]

Nor can we conclude on this record that the jury was misled about its responsibility to decide for itself, based on the statutory factors, whether death is *appropriate* for the defendant.

This is not the type of case in which the jury was "left . . . with the impression that its responsibility was merely to weigh aggravating and mitigating factors without regard to its view of the appropriateness of the alternative penalties, and that it was 'required' to return a sentence of death if 'aggravation outweighed mitigation' without, or even despite, each juror's *personal* conclusion from the evidence, about whether a sentence of death was appropriate under the circumstances for the offense and offender." (*Allen, supra*, 42 Cal.3d at p. 1278, italics in original.) Although the court delivered the unadorned "shall" instruction in former CALJIC No. 8.84.2, we note it also correctly instructed the jury as set out above, and that it additionally instructed the jury that "the verdict of death is the *individual opinion of each juror*."[17] (Italics added.) Moreover, although the prosecutor three times emphasized the instruction's mandatory language in a potentially misleading manner,[18] he also correctly informed the jury on numerous

---

[16] Nor did counsel's respective arguments, each viewed as a whole, mislead the jury on this point. To the contrary, both counsel echoed the court's proper instruction. The prosecutor, although at one point having "counted" the various factors as he interpreted them to apply in this case, clearly told the jury, "you are not just to add up the number of factors. . . . [¶] In your own minds any one factor may be of such weight that it overwhelms two or three other factors or assumes a paramount position greater than anything else that's listed among the factors that the law instructs you in." Similarly, defense counsel stated: "Now, what the law says about how you weigh the factors is terribly important . . . . [¶] The law says you weigh the factors, you don't count them."

[17] Similarly, the jury's verdict form recites: "The verdict of death is the individual opinion of each juror."

[18] He told the jury: "The law is that if factors in aggravation outweigh the factors in mitigation you must impose the death penalty. The language is very clear. It says 'shall.' That means must. You have to. No discretion. [¶] Conversely if the factors in mitigation outweigh the factors in aggravation, then you must, that is you shall impose life imprisonment. And, again, there is no discretion in that area." Later, he stated: "[Y]ou decide the case by deciding whether or not the aggravating outweigh[] the mitigating. [¶] If they do, you impose the death penalty. If they don't, you don't. It's really rather straightforward." Finally, he informed the jury: "If you follow the law . . . and follow the mandate that if the aggravating factors outweigh the mitigating, you shall impose the death penalty, then that's what you shall do. And the aggravating circumstances outweigh the mitigating circumstances." We

occasions of its discretion and responsibility to decide individually whether death is the "appropriate" penalty.[19]

As above, any doubt we may have had about the jury's understanding of its duty and responsibility in this regard is dispelled by defense counsel's argument. He plainly and correctly informed the jury of its duty and responsibility: "The real focus of your deliberation, simply stated, is [*is*] *the death penalty necessary for [defendant]*. Is this extraordinary remedy at the hands of our citizenry something that must be done? [¶] *Should* we . . . kill him? [¶] At the end of considering all of those factors you have to say *I believe that that man should die,* and *that* is weighing the evidence. . . . [¶] [T]he weight that has to be given a decision of this importance is after looking at all of those factors *what do I believe conscientiously as a human being must happen*? Is not life without possibility of parole sufficient? [¶] When your foreperson signs the form to kill [defendant] or fix his sentence at life without possibility of parole, *it has to be a decision that each one of you individually believes in.* [¶] [Defendant] cannot and must not be executed unless *each of you in your own heart, in your own conscience believe it must happen.* [¶] And if ever there was a time when I urge you to give a defendant the benefit of that instruction that talks about *the individual opinion of each juror,* it is now." (Italics added.)

Viewing the record as a whole, we conclude the jury was not misled about the scope of its sentencing discretion under the 1978 law, and that no "factor (k)" or "*Brown*" error occurred.

B. *Other Asserted Errors*

1. *Excessive Multiple-murder Special Circumstance Findings*

 As noted above, the jury was erroneously allowed to find at the guilt phase, and consider as aggravating factors at the penalty phase, two "multiple-murder" special circumstances (§ 190.2, subd. (a)(3)) instead of one. We recently held in *Allen, supra,* 42 Cal.3d 1222, that although a jury was erroneously allowed to consider numerous, rather than only one

---

note that the prosecutor in *Allen, supra,* 42 Cal.3d at page 1279, made very similar statements.

[19] The prosecutor informed the jury, "[Y]ou are the judges of the defendant's character, his history, and what should be done with him. . . . [Y]ou . . . decid[e] what's ultimately to be done with the defendant." Later, while emphasizing that the jury should consider defendant's background and "social factors," the prosecutor stated: "[Y]ou are deciding what should be done with this man. And that's what you are doing." He then told the jury, "[w]hen you decide what should be done with this man," it should consider his lack of remorse. He concluded by telling the jury that its job was to "decide the appropriate penalty and punishment" for defendant.

"multiple-murder special circumstance," this "did not permit consideration of any evidence that was not otherwise admissible and relevant to the penalty decision." (*Id.*, at p. 1281.) The prosecutor here did not exploit the "inflation" of the special circumstances at closing argument, but instead focused on the circumstances of the crime and defendant's violent and criminal past as factors militating toward a death verdict. As in *Allen*, we are confident that the improper "inflation" of the special circumstances did not, on the facts of this case, amount to prejudicial error requiring reversal of the penalty. (See *id.*, at pp. 1281-1283.)

### 2. *Remorse*

■ The prosecutor argued, without objection, that various statements made by defendant after the crimes showed he lacked remorse for the crimes. Defendant claims this was error for a number of reasons, none of which, we have determined, has merit.

The evidence disclosed that after killing Aguilar, defendant "kind of laughed" about the act, and complained, "The bitch wouldn't die. The bitch wouldn't die." At closing argument, the prosecutor reminded the jury that defendant had never expressed remorse but, in fact, "we have a couple of things in the other direction." Chief among those items was the one of the notes written by defendant shortly after the Aguilar murder, which ended: "[I] am a, Rebel & a Loner. . . . —I am gone—Find Me, Punk—." The prosecutor concluded: "That I think characterizes [defendant's] attitude from start to finish in this whole crime. Callous, cold, remorseless killings for no good reason except revenge and you are getting in my way."

As we have recently held in *People* v. *Ruiz* (1988) 44 Cal.3d 589, 622 [244 Cal.Rptr. 200, 749 P.2d 854], the prosecutor's argument that defendant lacked remorse was not error.

### 3. *Nonapplicable Mitigating Factors*

■ Defendant claims the court should have deleted from the instructions the statutory aggravating and mitigating factors that were "inapplicable" under the evidence and that it was error to read to the jury the entire statutory list. We have recently rejected this argument in *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250] [1977 law], and *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127] [1978 law].

### 4. *Extreme Mental or Emotional Disturbance*

■ The jury was instructed pursuant to CALJIC No. 8.84.1 to consider, under factor (d), "Whether or not the offense was committed while the

defendant was under the influence of extreme mental or emotional disturbance." (§ 190.3, factor (d).) Defendant claims that by limiting consideration to "extreme" mental or emotional disturbance and not permitting lesser disturbances to be considered the instruction violates the constitutional requirement that the jury must be permitted to give weight to any aspect of a defendant's character, record, or offense which may be offered to mitigate punishment. We have rejected this claim of error in our discussion of the asserted "factor (k)" error.

### 5. *Use of the 1971 Battery as an Aggravating Factor*

At the guilt trial, *defendant* introduced evidence of the 1971 incident in which he fired a shotgun at a man. That evidence was presented in connection with other testimony suggesting that before the 1973 automobile accident, defendant was kind, gentle and responsible; his former wife testified that the sole incident of violence before the accident was the 1971 shooting.

At the penalty trial a certified document showing defendant's conviction of misdemeanor battery for the 1971 shooting incident was introduced by the prosecutor without objection. The prosecutor then presented the testimony of the shooting victim, who described the event. Thereafter the court instructed pursuant to CALJIC No. 8.84.1 on the aggravating and mitigating factors to be considered by the jury. Factor (b) permits the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).)

The court further instructed that the 1971 shooting (among other events) had to be proved "beyond a reasonable doubt" before it could be considered by the jury as an aggravating factor. The court then instructed on the elements of "assault" and "assault by means of force likely to produce great bodily injury," as well as other crimes related to the other penalty phase evidence. It gave no instruction on the lesser crime for which defendant had been convicted for the 1971 incident (misdemeanor battery).

Defendant asserts it was error for the jury to be allowed to find, as an aggravating factor, that he engaged in conduct "more serious" than the misdemeanor battery for which he had been convicted in 1971.

To the extent his claim rests on the theory that the prosecution was not entitled to inform the jury, through testimonial evidence, about the circumstances of the prior criminal activity, the claim is meritless. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 754-757 [244 Cal.Rptr. 867, 750 P.2d 741].)

Moreover, even assuming it was error to instruct the jury in such a way that it might have concluded the 1971 incident was to be evaluated as constituting a crime containing elements other than those of misdemeanor battery of which defendant had been convicted, on this record we cannot conclude such error was prejudicial. First, we reiterate that the evidence disclosing the circumstances of the 1971 incident was properly before the jury. Second, in addition to the 1971 incident, the jury was properly instructed on, and hence considered in aggravation under factors (b) or (c) of section 190.3, the circumstances of the following violent criminal activity and felony convictions: defendant's 1972 first degree burglary (while armed with a firearm); his 1976 armed robbery and auto theft; his 1980 burglary and robbery in which he inflicted serious injuries on a victim; and his armed robbery of a milk store shortly before the Swartz murder. In view of all this aggravating evidence of prior violent crimes and felony convictions, as well as the circumstances of the underlying capital crimes (§ 190.3, factor (a)), we conclude that any error in instructing the jury regarding the 1971 incident could not have affected the verdict.

### 6. *Waiver of Right to Be Present*

 After the jury commenced its penalty phase deliberations, the court asked for a stipulation that if the jury requested any evidence be brought to it or if it requested any instructions, the matter may be sent to the jury "without our having to get back together again." The prosecutor and defense counsel so stipulated. Defendant was not asked whether he joined in the stipulation. The court stated to counsel that if there were any questions of substance counsel (and apparently defendant) would be called.

The jury subsequently requested instructions, probation reports, a list of the evidence and witnesses from the penalty and guilt phases, all of the medical records, the two notes defendant wrote after the Aguilar murder, and the testimony of a witness. There was an express stipulation by counsel as to the witness's testimony. Although the record is silent, it is undisputed that the jury received the requested matters.

Because there is no showing the jury was furnished with any improper matters, we discern no error. In any event, we conclude any assumed error was nonprejudicial.

The judgment is affirmed in its entirety.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in the judgment. I am of the opinion that there occurred no prejudicial error going to guilt, that at least one special

circumstance finding is unquestionably valid, and that there occurred no prejudicial error going to penalty.

I write separately, however, because I feel compelled to express my belief that the question of *Brown* error is much closer than the majority suggest. (*People* v. *Brown* (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom*. *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

At trial the court instructed the jury in accordance with former CALJIC No. 8.84.2 and its mandatory sentencing formula. Three times in closing argument the prosecutor emphasized and exploited that instruction's potentially misleading language.

Near the beginning of his argument the prosecutor stated: "The law in its wisdom through our State Legislature, of course, has set forth a series of factors for you to take into account. *The law is that if factors in aggravation outweigh the factors in mitigation you must impose the death penalty.* The language is very clear. It says 'shall.' That means must. You have to. No discretion. [¶] Conversely if the factors in mitigation outweigh the factors in aggravation, then you must, that is you shall impose life imprisonment. And, again, there is no discretion in that area." (Italics added.)

Later on, the prosecutor picked up the theme: "And then at the conclusion of the case, of your going through the factors, you decide the case by deciding whether or not the aggravating outweighed the mitigating. [¶] *If they do, you impose the death penalty. If they don't you don't. It's really that straightforward.*" (Italics added.)

Toward the close, the prosecutor returned to this theme yet again: "If you follow the law and go through the penalty factors that the Judge will instruct you and you are astute and examine the case in the light thereof and you follow the mandate that if the aggravating factors outweigh the mitigating, you shall impose the death penalty, then that's what you shall do."

It is only because defense counsel's argument and the court's other instructions (which the majority set forth at length) plainly disclosed the proper scope of the jury's sentencing responsibility and discretion and thereby neutralized the prosecutor's comments that I am able to conclude the jurors in this case were not misled by former CALJIC No. 8.84.2.

In spite of my disagreement with the majority's analysis, as stated above I find no reason to disagree with its disposition. Accordingly, I concur in the judgment.

**BROUSSARD, J.**—I concur in the affirmance of the convictions and the findings of special circumstances. I dissent from the affirmance of the penalty.

The evidence showed that a substantial portion of defendant's brain had been surgically removed prior to the events evidenced herein, and that there was a change in defendant's character and conduct following the surgery from a kind and gentle person who was hardworking and responsible to a person who became unpredictable and violent, and who ultimately went berserk. Neither the instructions of the court nor the arguments of counsel properly advised the jury how to view this crucial evidence. A properly instructed jury might have concluded that the brain surgery causing the change in behavior was a substantial mitigating factor and spared defendant's life.

Although the instructions and the arguments of the prosecutor and defense counsel did not preclude consideration of the mitigating evidence, they likely misled the jury to believe that the brain surgery and its results could not be a mitigating factor. At best the instructions and arguments misled the jury to believe that the brain surgery and the change in character could only be a mitigating factor if they impaired defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law at the time of the offense.

The jury should have been advised that the brain surgery and its results could be considered a mitigating factor whether or not they affected defendant's capacity at the time of the offense. The improper limitation on the jury's consideration of the mitigating evidence may well have precluded the finding of *any* mitigating factor, as urged by the prosecutor. If so, the result was that the jury was compelled to return a verdict of death under the mandatory instruction limiting mitigating factors to those specified in the statute.

"This limitation on the jury's consideration of evidence in mitigation of penalty in a capital case contravenes the mandate of the federal Constitution. In *Lockett* v. *Ohio, supra,* 438 U.S. 586, the Supreme Court held that 'the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . [¶] . . . [A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be

imposed in spite of factors which may call for a less severe penalty.' (*Id.* at pp. 604, 605, italics in original, fns. omitted.)" (*People* v. *Davenport* (1985) 41 Cal.3d 247, 283 [221 Cal.Rptr. 794, 710 P.2d 861].)

In order to uphold the validity of the death penalty law, this court construed factor (k) of Penal Code section 190.3 to permit the jury to consider the general character, family background or other aspects of the defendant. (*People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 [196 Cal.Rptr. 309, 671 P.2d 813].) We recognized that factor (k), referring to circumstances which extenuate the gravity of the crime, might be understood by a jury to relate only to the gravity of the crime and not to circumstances that relate to the general character, family background or other aspects of the defendant. In order to avoid misunderstanding in the future, we directed that juries in the future be given a clarifying instruction. (*Id.* at p. 878, fn. 10.)

In the instant case, the jury did not receive a clarifying instruction, and thus the jury was left with the ambiguity recognized in *Easley*.

The prosecutor unequivocally and erroneously stated that factor (k) was inapplicable because it related to the circumstances of the crimes and there was nothing mitigating or extenuating about the commission of the crimes. He never retreated from this position.[1]

Defense counsel did not challenge the prosecutor's position that factor (k) related only to the circumstances of the crime. After discussing factors (a), the circumstances of the present conviction, (b), the other violent crimes, and (c), prior convictions, he extensively discussed factors (d) and (h) together because they both related to defendant's condition at the time of the offenses. He then said that the next factors were inapplicable. After briefly discussing those factors, including factor (k), he discussed the instructions defining mitigating and permitting consideration of sympathy. He then made an ambiguous statement which conceivably could be interpreted as relating to factor (k) but more likely would be understood as

---

[1] The prosecutor went through each of the statutory factors in order using numbers rather than letters. When he came to factor (j), he stated: "Accomplice or minor participation. That, number 10, more or less goes with number 5.

"Obviously, Jim Odle was not an accomplice or a minor participant, but really in fairness I will just say that that really doesn't apply to this case because, obviously, by your verdict you found he was the major participant.

"Other extenuating circumstances regarding the gravity of the crimes.

"That is, is there anything about the crimes that you can think of—sit down and say to yourself I'm going to try to think of anything in Jim Odle's favor regarding how he committed those crimes which are extenuating, and you won't be able to do it because there is nothing extenuating about those crimes."

arguments made on the basis of the instructions defining mitigating and permitting sympathy.[2]

Defense counsel's ambiguous argument may not be viewed as eliminating the danger that the jury misunderstood factor (k). The jury by its verdict obviously rejected defense counsel's argument, and even when defense counsel's statements are clear and unambiguous in clarifying the meaning of the instructions, it is pure speculation to assume that the jury accepted that portion of counsel's argument while rejecting unidentified other parts. When, as in the instant case, the jury is instructed only in the words of the statute, the prosecutor unequivocally and erroneously argues that factor (k) relates only to the circumstances of the crime, and defense counsel's statement is ambiguous as to whether the brain surgery and its results could relate to factor (k), it is unreasonable to conclude that defense counsel's ambiguous statement shows that the jury was not misled.

While the brain surgery evidence was discussed at length by both the prosecutor and defense counsel, neither ever stated that factor (k) was applicable, and the only reasonable conclusion is that the jury was misled into believing that the brain surgery evidence did not relate to factor (k). The effect of this misunderstanding or error was to improperly limit the jury's consideration of the brain surgery evidence.

---

[2] In discussing defense counsel's argument, the majority at page 419 substitute "[under factor (k)]" for "in the other circumstance which is not a legal excuse" which I have italicized in the quotation below. Although there may be some ambiguity, the substitution is not warranted.

After discussing factor (j), defense counsel stated: "The final factor is any other circumstance which extenuates or mitigates.

"Now, what the jury has the duty to do in a penalty case is really to consider anything that they feel or an individual feels is appropriate.

"As an example: You are allowed to consider mitigation or extenuation. And the Judge will tell you that 'mitigation' is defined as an abatement or diminution of a penalty or punishment.

"Mitigating circumstances are such as to not constitute a justification or excuse of the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability.

"So the concept of mercy enters your deliberation which it does not in the guilt phase.

"You will be instructed as follows: The Judge will tell you that you were previously in the guilt phase of this trial that sympathy or pity for a defendant shall not influence your consideration of the evidence.

"In this the penalty phase of the trial the jury may properly consider sympathy or pity for a defendant in determining whether to show mercy and spare the defendant from execution. That is different.

"So *in the other circumstance which is not a legal excuse,* I'm not talking about excusing his conduct, I'm talking about considering his conduct and trying to make a determination whether there is an extenuating circumstance that is sufficient in your mind not to require him to be executed."

Both the prosecutor and defense counsel argued as to whether defendant's loss of part of his brain could be considered under factor (h). However, factor (h) is limited to whether or not "at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication." There was no evidence that defendant's capacity was impaired at the time he killed Officer Swartz. The evidence was sharply conflicting as to whether defendant's capacity to appreciate or conform was impaired at the time of the Aguilar killing, and, as the prosecutor pointed out, the jury at the guilt trial had rejected the claim that defendant was impaired to the extent that he did not know what he was doing.

If the jury concluded that defendant's capacity to appreciate or conform "at the time of the offense" was not impaired, it was left with no mitigating factor to consider. Although the prosecutor and defense counsel discussed the brain surgery and its results in connection with the sympathy instruction, sympathy is not one of the factors enumerated by the trial court as a potentially mitigating factor. The jury was directed to weigh only the statutory factors, and the absence of any mitigating factor—with the presence of clear aggravating factors—would preclude a verdict of life without possibility of parole. (See *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 398-399 [95 L.Ed.2d 347, 352-353, 107 S.Ct. 1821, 1824].)

Moreover, even if the jury concluded that defendant's capacity to appreciate or conform at the time of the Aguilar offense was impaired, the mitigating factor is limited to that impairment and would not be entitled to the full consideration and weight it might receive if considered under factor (k). Obviously an argument that defendant's life should be spared because life had already treated him cruelly was a much stronger argument in the circumstances than an argument based on extenuation of only one of the two murders. (See *People* v. *Lanphear* (1984) 36 Cal.3d 163, 168, fn. 1 [203 Cal.Rptr. 122, 680 P.2d 1081].)

I conclude that the prosecutor's argument in the absence of a clarifying instruction improperly precluded a finding of any mitigating circumstance unless the jury found that the brain surgery and its results affected defendant's capacity at the time of the offenses.

The error is prejudicial in that it probably took from the jury the crucial issue presented by the strong mitigating evidence. The jury was instructed that it "shall" impose the death penalty if aggravating circumstances outweighed mitigating circumstances. If the jury concluded that defendant's capacity to appreciate and conform was not impaired during either killing,

the death penalty was automatic because there were obviously strong aggravating circumstances and no mitigating circumstances to weigh against them. If the jury concluded that there was some impairment during the Aguilar killing, it was nevertheless limited in considering the mitigating effect to the impairment "at the time of the offense," rather than considering as a mitigating factor the change in defendant's character resulting from removal of a substantial portion of his brain.

A properly instructed jury might have found that the removal of a substantial portion of defendant's brain and the change in his character and conduct following the surgery from a kind and gentle person who was hard working and responsible to a violent and uncontrolled person was mitigating under factor (k) and warranted compassion. In my view there is a reasonable possibility that a properly instructed jury would have concluded that life without possibility of parole was the appropriate penalty.

Appellant's petition for a rehearing was denied June 30, 1988. Broussard, J., was of the opinion that the petition should be granted.