Filed 11/13/20  P. v. Owens CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAMIEN OWENS,<br><br>Defendant and Appellant. | E072711<br><br>(Super.Ct.No. INF039223)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The court has reviewed the petition for rehearing filed November 6, 2020.  The petition is denied.  The opinion filed in this matter on November 2, 2020, is modified as follows:

On page 13, replace the first full paragraph, which begins, "On appeal, defendant challenges the . . . ."  The first full paragraph should read:

Defendant contends the court prejudicially erred and violated his constitutional right to due process by summarily denying his petition without giving him the

1

opportunity to file a reply to the prosecution's response.  Defendant maintains the court's error in failing to allow defense counsel to file a reply to the People's response was structural error, requiring automatic reversal of its order denying the petition.  Defendant argues that even if subject to a harmless error analysis, the court's failure to allow the filing of a reply was prejudicial, requiring reversal.  We hold that the proper procedure for challenging a felony-murder special-circumstance finding is the filing of a habeas petition and, if he was entitled to have his counsel file a reply, it would not have altered the result of the proceedings.

On page 17, in the first full paragraph that begins, "Defendant contends that the jury's true finding . . . ," replace the second sentence with the following sentence: "Defendant argues that even if subject to a harmless error analysis, the court's failure to allow the filing of a reply was prejudicial, requiring reversal."  The first full paragraph should read:

Defendant contends that the jury's true finding on the felony-murder special-circumstance finding does not necessarily show that he is ineligible for relief. Defendant argues that even if subject to a harmless error analysis, the court's failure to allow the filing of a reply was prejudicial, requiring reversal.

On page 18, footnote 3, add the full citation the first time we cite to "*Banks* and *Clark*."  Footnote 3 should read:

We acknowledge the contrary holdings in *People v. Torres* (2020) 46 Cal.App.5th 1168, review granted June 24, 2020, S262011; *People v. Smith* (2020) 49 Cal.App.5th 85, review granted July 22, 2020, S262835; and *People v. York* (2020) 54 Cal.App.5th 250,

2

which would allow defendants to challenge the validity of murder convictions that predated the *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) decisions, by requiring the People to prove, once again, the special circumstances beyond a reasonable doubt.  We simply disagree that the language of section 1170.95 provides defendant an opportunity to relitigate special circumstance findings because of the clarification of the requirements for those findings in *Banks* and *Clark*.

On page 25, replace footnote 5.  Footnote 5 should now read:

At oral argument, assuming arguendo that we could review the case for substantial evidence, defendant's counsel conceded that defendant was a "major participant," even within the clarified definition of those terms by *Banks* and *Clark*.  Thus, for argument's sake, defendant challenges only the "reckless indifference" element of the crime.

There is no change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
Acting P. J.

We concur:

FIELDS_____
J.

MENETREZ_____
J.

3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAMIEN OWENS,<br><br>        Defendant and Appellant. | E072711<br><br>(Super.Ct.No. INF039223)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Meredith S. White and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Damien Owens filed a petition for resentencing pursuant to Penal Code section 1170.95,[1] which the court denied. On appeal, defendant contends the court committed structural error in denying his petition without allowing him the opportunity to file a reply brief. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

"About 2:00 a.m. on December 19, 2001, Officer Denney of the Desert Hot Springs Police Department saw a midsize, four-door white car with its parking lights on parked in front of an apartment complex at Second and Mesquite. In the car were a female driver, Shalamar Wiley, and a male passenger, [codefendant Rayshawn Session]. Denney told them it would be a good idea to leave, because they were parked in front of a known 'crack house.'" (*Owens*, *supra*, E033148.)

"Russell Wilson lived in a one-bedroom, one-bathroom apartment in the complex. Faye Ransom, Wilson's girlfriend, lived with him in the apartment. Also living at the apartment were Ransom's mother, Catherine Daniels; Ransom's niece, Sophia Lindsey; and Angela Rippy, a friend of Ransom's. Sophia Lindsey's mother, Mary Lindsey, also was at the apartment on the morning of December 19, 2001." (*Owens*, *supra*, E033148.)

"Sometime after midnight that morning, defendant . . . came to the apartment with [codefendant Demetrius Walton]. Ransom was in bed in the bedroom at that time,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] We take judicial notice of the record in *People v. Owens et al.* (Apr. 12, 2005, E033148) [nonpub. opn.] (*Owens*), defendant's appeal from the original judgment. (Evid. Code, § 459.) We derive much of our factual recitation from the opinion in that matter.

2

watching television. Wilson also was in the bed, sleeping. Ransom and her mother had known [defendant] for several years and considered him a friend." (*Owens*, *supra*, E033148.)

"While [defendant] and Walton were visiting in the living room, there was a knock at the front door of the apartment. Sophia Lindsey answered the door and then told [defendant], '[Y]our friend wants you.' [Defendant] went out briefly and came back in. Walton stayed in the apartment. Later there was another knock, and Sophia Lindsey told [defendant] his friend wanted him again. [Defendant] went out again for a little longer than the first time and came back. Again, Walton stayed in the apartment while [defendant] was gone." (*Owens*, *supra*, E033148.)

"[Defendant] went into the kitchen and got a plastic trash bag. Either [defendant] or Walton asked if Walton could use the bathroom. Ransom agreed. The bathroom was accessible only through the bedroom, so Walton went through the bedroom, where Wilson and Ransom were, and into the bathroom. However, he was only there for a short time and did not flush the toilet. Then he went back to the living room, and he and [defendant] conversed." (*Owens*, *supra*, E033148.)

"Angela Rippy was in the kitchen smoking 'crack.' She heard the dogs barking at the front door. As she opened the door to let them in, two men walked in and went toward the bedroom." (*Owens*, *supra*, E033148.)

"When Ransom heard the front door of the apartment open, she told Sophia Lindsey to lock the door and not to open it anymore. Then she got up and locked the door herself." (*Owens*, *supra*, E033148.)

3

"As Ransom started back to the bedroom, she saw Session standing by the bedroom door and Walton sitting on the loveseat. Ransom had not seen Session before. She went into the bedroom and tried to close the door, but Session came in, grabbed her by the back of her head, and stuck a handgun to her head." (*Owens*, *supra*, E033148.)

"Session said, 'Bitch, shut up, don't say nothing. [G]ive me the money, and give me the dope.' He shoved Ransom down on the bed. Ransom said she didn't have any money and there was no dope there. Session said, 'Bitch, give me the money or the dope or I'll blow your fucking head off.' He jammed the gun in her head again and tried to throw a sheet over her face. However, she was still able to see what was going on. Walton had been in the bedroom while these events were occurring." (*Owens*, *supra*, E033148.)

"Ransom could feel Wilson, who was still in the bed, try to turn over. When this happened, Session said, 'Fuck that, son of a bitch, fuck you,' and shot Wilson in the chest." (*Owens*, *supra*, E033148.)

"[Defendant] at that time was in the living room with Rippy, Daniels, and Mary and Sophia Lindsey. Either before or after the shot, [defendant] told the others not to 'trip' and that he and his companions were just there to collect a debt that had been owed for a long time. Wearing gloves, [defendant] unrolled a plastic trash bag and started undoing the DVD player from the television. He put the DVD player in the bag." (*Owens*, *supra*, E033148.)

"After he shot Wilson, Session said to Walton, 'Man, look, that mother fucker's got on gold, take those fuckin' rings off his hands, get those rings.' Walton took four

4

rings off Wilson's fingers. Then Walton went over to the Play Station and yanked the wires off. He said, '[T]hat mother fucker, fuck this, I'm taking this shit,' and he took the Play Station. Session and Walton left the room." (*Owens*, *supra*, E033148.)

"Rippy and Sophia Lindsey were in the living room when Session and Walton came out of the bedroom. Session stuck the gun in Lindsey's face and told her and Rippy to get down on the floor. After getting down, Rippy looked up, and Session swung around, pointed the gun at her, and said, 'Bitch, I'll blow you away,' and 'I said get your head down, bitch, before I blow your mother fucking brains out.'" (*Owens*, *supra*, E033148.)

"[Defendant], Walton, and Session left the apartment together. After they left, Ransom went outside and saw a little white car with Owens and two or three other people driving away. [¶] Wilson died of a gunshot wound to the chest." (*Owens*, *supra*, E033148.)

"Following their arrests, all three defendants voluntarily spoke to district attorney investigators about the facts of the crimes. Investigator McDonagh testified about the contents of the statements, and a recording of Session's statement was played for the jury. The court instructed the jury that the evidence of [defendant's] and Walton's statements could only be considered against the defendant who made the statement. Because Session testified at trial, the court instructed that the jury could consider his statement against all three defendants." (*Owens*, *supra*, E033148.)

"[Defendant] was interviewed in the evening on December 19, 2001, and shortly after midnight the following morning. He stated he had gone to Wilson's home the

5

morning of December 19 to make some money. The idea was to rob Wilson, because Wilson wouldn't report the crime to the police. [¶] [Defendant] admitted he took the DVD player. He also admitted telling Sophia Lindsey outside the apartment that Wilson was going to get 'jacked.'" (*Owens*, *supra*, E033148.)

"Session stated that in the hours before the shooting he was at the residence of Shalamar Wiley, a close friend. At some point, he and Wiley drove to Walton's house in Wiley's car, which was white. When they arrived, Walton and [defendant] were standing outside. Session had known Walton and [defendant] for several years. [Defendant] was trying to sell drugs but wasn't having very good luck." (*Owens*, *supra*, E033148.)

"[Defendant] said they needed to make some money. He said he knew of an opportunity to get about $500 cash and a couple of ounces of dope. He said a man owed him some money. He said they could do it that night, but they didn't have a ride. Session said Wiley could give them a ride. Walton was listening and said it sounded like a good idea." (*Owens*, *supra*, E033148.)

"Later that day, Session asked Wiley to give him, [defendant], and Walton a ride to Desert Hot Springs so they could do some business. She agreed. Session told the others not to say anything around Wiley about what they were going to do, or she would not give them a ride." (*Owens*, *supra*, E033148.)

"[Defendant] had been to Wilson's apartment before. He told Session and Walton who would be at the apartment. [Defendant] said he and Walton would go in first to see who had the money and how much there was. He also said he would bring a gun and put

6

it under the car seat. He said he could not carry the gun when he went in the apartment, so Session should carry it." (*Owens*, *supra*, E033148.)

"On the way to Desert Hot Springs, [defendant] told the others how to get to the apartment. When they arrived and parked in front of the complex, [defendant] and Walton got out of the car, and Session and Wiley sat and waited." (*Owens*, *supra*, E033148.)

"After an hour or two, Session got tired of waiting. He went to the apartment and knocked. [Defendant] answered the door, along with a lady Session did not know. [Defendant] said he would come outside and talk to Session in a few minutes." (*Owens*, *supra*, E033148.)

"Later, [defendant] came out and said, '[L]ets [*sic*] go up in here and get my money.' Session said, '[A]ll right lets [*sic*] go.' Session grabbed the gun, and he and [defendant] entered the apartment. Walton was sitting on the couch. [Defendant] told Session he was going to stay in the living room to make sure the girls who were there did not go anywhere. He told Session to go into the bedroom." (*Owens*, *supra*, E033148.)

"Session went into the bedroom and saw the lady who had come to the door earlier, watching television. Session had the gun at his side. He said to her, '[W]here's you're [*sic*] all money and dope bag.' The lady said, ' . . . I don't have it. He has everything.' She got off the bed, and Session pushed her out of the way so he could get to Wilson's side of the bed." (*Owens*, *supra*, E033148.)

"Walton walked into the room. Wilson was still sleeping. Walton told Session to wake him up. Session nudged Wilson, and he woke up and saw the gun. His reaction

7

caused Session to put up his hand, and the gun went off. Session said, '[L]ets [*sic*] just leave' and walked out of the apartment." (*Owens*, *supra*, E033148.)

"Session got in the car with Wiley. A couple seconds later, [defendant] and Walton ran to the car and jumped in with 'all the stuff' in their hands. Session told Wiley to drive away. He told Wiley, ' . . . I think I shot him, I think I killed him.' He told Wiley to park near a house so he could dispose of the gun. He left it in a flower pot. Wiley dropped Session off at his girlfriend's sister's house." (*Owens*, *supra*, E033148.)

"Session stated he and the others only went to the apartment to rob Wilson. Asked why, in that case, he took the gun with him, Session stated, 'Well, what do you rob somebody with . . . .' [¶] After making his recorded statement, Session led the investigators to the gun." (*Owens*, *supra*, E033148.)

"Walton was interviewed in January 2002, in the presence of his attorney and a defense investigator. He said he had gone to the apartment complex on December 19, 2001, and was in the car when the police officer contacted Wiley and Session in front of the complex. Walton bent down and was out of the view of the officer." (*Owens*, *supra*, E033148.)

"After the officer left, Walton went inside the apartment to use the bathroom located in the bedroom. He left the apartment and went back outside to the front of the complex. [¶] Walton denied removing any property from the apartment and denied being in the apartment when Wilson was shot." (*Owens*, *supra*, E033148.)

"At trial, Session testified he went to the apartment complex on December 19, 2001, with Wiley, [defendant], and Walton to sell some drugs. Wiley did not want to go

8

in the apartment, so Session stayed with her while [defendant] and Walton went inside to sell the drugs. Session, [defendant], and Walton were supposed to take turns sitting in the car with Wiley. [Defendant] brought a gun along and put it behind the car seat." (*Owens*, *supra*, E033148.)

"After an hour and a half, [defendant] and Walton had not returned, so Session went to the door of the apartment and asked them whether they wanted to switch places. They declined, so Session went back to the car." (*Owens*, *supra*, E033148.)

"Session again went to the door of the apartment and returned to the car. Then he went to the apartment a third time, went inside, and sat there talking to [defendant]. Walton was sitting and smoking a cigarette. Session had never seen any of the other people in the apartment before." (*Owens*, *supra*, E033148.)

"After a while, Session heard an argument going on in the bedroom. He looked in the bedroom and saw Ransom standing inside arguing with a man Session did not recognize. Wilson was lying in the bed. The man who had been arguing with Ransom came out of the room and asked if anyone had a gun. Session had brought the gun from the car for protection, because the apartment was a dope house. The man asked to use the gun, so Session gave it to him. The man put it in his waistband and walked back into the bedroom." (*Owens*, *supra*, E033148.)

"The man told Ransom that since they didn't have his money, he was going to take the DVD player and Play Station as collateral. He told Sophia Lindsey to get him a bag to put the stuff in. Ransom woke Wilson up to tell him the man was taking the stuff. Wilson and the man started arguing. The man tried to hit Wilson with the gun, but

9

Wilson moved out of the way, and the gun bounced off the bed and went off." (*Owens*, *supra*, E033148.)

"Session asked the man why he shot Wilson. The man said it was an accident. Session took the gun back and started walking out the door. The man unhooked the Play Station and went out of the bedroom. Session suggested he and [defendant] leave. [Defendant] took the DVD player, and he, Session, and Walton left the apartment. The man who had shot Wilson left right after that. Session thought the name of the man who shot Wilson was Bam, but he was not sure. [¶] Session disposed of the gun because he was afraid of getting pulled over and caught with it when it had been used to kill Wilson." (*Owens*, *supra*, E033148.)

"Session further testified that his extrajudicial statement to the police was not truthful. He made the statement because the investigator said they knew he did it, and if he confessed and said the killing was an accident, he would get voluntary manslaughter. Before Session made the statement, the investigator went over the whole case with him. Based on what the investigator told him, he made the statement." (*Owens*, *supra*, E033148.)

"According to Session, when he and the others went to the apartment complex on December 19, 2001, Walton did not know what the plan was. On May 6, 2002, Session sent a letter to Walton's mother stating Walton had nothing to do with what happened. The letter also stated that when Session gave the gun to the man who shot Wilson, he did not know the man was going to shoot, because all the man said was that he was going to scare Wilson because Wilson owed him money. On June 28, 2002, Session wrote to

10

Walton's attorney, stating that although Walton was inside the apartment at one point, he was not there when the crime took place and did not have any knowledge of what happened in the apartment." (*Owens*, *supra*, E033148.)

"After Session testified, Investigator McDonagh testified he did not offer or give Session anything in return for his extrajudicial statement. According to McDonagh, the question whether he could assist Session in any way never came up." (*Owens*, *supra*, E033148.)

On September 11, 2002, after the completion of a joint trial, "a jury convicted [defendant, Walton, and Session] of (1) first degree murder with robbery and burglary felony-murder special circumstance[s], (2) first degree robbery and (3) first degree burglary. The jury found a principal was armed in the commission of the offenses. The jury further convicted Session of three counts of making a terrorist threat and found he personally and intentionally discharged a firearm causing great bodily injury or death." (*Owens*, *supra*, E033148, fn. omitted.)

"The court sentenced [defendant] and Walton to one year plus life without the possibility of parole and Session to 27 years to life plus life without the possibility of parole." (*Owens*, *supra*, E033148.) On appeal from the judgment, defendant contended "the admission of a redacted version of his extrajudicial statement to the investigators prejudiced his defense"; the court's denial of his motion for a separate trial was reversible error; and there was insufficient evidence to support the felony-murder special circumstance allegations against him when he moved for acquittal pursuant to section 1118.1. (*Ibid*.) This court affirmed the judgment as to defendant. (*Ibid*.)

11

On February 19, 2019, defendant filed a petition for resentencing pursuant to section 1170.95. The court appointed counsel to represent defendant on the petition. On April 17, 2019, the People filed a response to defendant's petition arguing that section 1170.95 was unconstitutional on several bases; they additionally argued defendant was ineligible for relief under section 1170.95 because, although he was not the actual killer, he was a major participant in the murder in which the jury found true, as a requisite finding of the special circumstance, that he had acted with reckless indifference to human life.

On April 26, 2019, the court held a hearing on the petition. Defense counsel declared a conflict. Counsel for the "Conflict Defense Lawyers" indicated he was prepared to accept appointment and requested the matter be stayed until August 16. When asked for comment, the People indicated "there was a robbery/murder special circumstance. CALCRIMs 702 and 703 [*sic*] were given. The jury had to find major participant and reckless indifference."

The court indicated, "Well, there were two specials, but all right. These look like CALJICs." The court confirmed, "It was [CALJIC] 8.80.1 [that] was given. And it required—and it says: If you find the defendant was not the actual killer of the human being, or if you're unable to decide, you must be satisfied beyond a reasonable doubt that the defendant with the [specific] intent to kill aided, abetted, counseled, commanded, induced, solicited, requested or assisted any act, or in the commission of murder in the first degree or reckless indifference to human life, and as a major participant, aided,

12

abetted and so on and so forth. This matter is summarily denied." Defense counsel objected for the record.

## II. DISCUSSION

On appeal, defendant challenges the trial court's summary denial of his section 1170.95 petition for resentencing. Defendant argues that (1) the court violated his constitutional right to due process by summarily denying his petition without affording him an opportunity to file a reply to the response; and (2) that the evidence is insufficient to support a finding that he was a major participant who acted with reckless indifference to human life under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). We hold that the proper procedure for challenging a felony-murder special-circumstance finding is the filing of a habeas petition and, if he was entitled to have his counsel file a reply, it would not have altered the result of the proceedings.

### A. Legal Background.

"In 2018 the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) . . . , which abolished the natural and probable consequences doctrine. . . . Under section 189, subdivision (e), as amended by Senate Bill No. 1437, a defendant is guilty of felony murder only if he: actually killed the victim; directly aided and abetted or solicited the killing, or otherwise acted with the intent to kill; or 'was a major participant in the underlying felony and acted with reckless indifference to human life.'" [Citations.] The legislation also enacted section 1170.95 [(Stats. 2018, ch. 1015, § 4)], which established a procedure for vacating murder convictions for defendants who would no

13

longer be guilty of murder because of the new law and resentencing those who were so convicted." (*People v. Murillo* (2020) 54 Cal.App.5th 160, 166 (*Murillo*).)

"Section 1170.95 allows a defendant serving a sentence for felony murder who would not be guilty of murder because of the new law to petition for resentencing. The statute requires a defendant to submit a petition affirming that he meets three criteria of eligibility: (1) He was charged with murder in a manner 'that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine' [citation]; (2) He 'was convicted of' or pleaded guilty to 'first degree murder or second degree murder' [citation]; and (3) He 'could not be convicted of first or second degree murder because of changes to Section[s] 188 or 189 made effective' as a part of Senate Bill No. 1437 [citation]. As described above, those changes eliminated the natural and probable consequences doctrine as a basis for murder liability, and added a requirement for felony murder that a defendant must have been at least a major participant in the underlying felony and have acted with reckless indifference to human life." (*Murillo*, *supra*, 54 Cal.App.5th at p. 166.)

Section 1170.95, subdivision (b), states that the petition must include: a declaration from the petitioner that he or she is eligible for relief under the statute, the superior court's case number and year of conviction, and a statement as to whether the petitioner requests appointment of counsel. (§ 1170.95, subd. (b)(1).) If any of the required information is missing and cannot "readily [be] ascertained by the court, the court may deny the petition without prejudice to the filing of another petition." (§ 1170.95, subd. (b)(2).)

14

Section 1170.95, subdivision (c), sets forth the trial court's responsibilities once a complete petition has been filed: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. . . . If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

If the court issues an order to show cause, it must hold a hearing to determine whether to vacate the murder conviction. (§ 1170.95, subd. (d).) At that hearing, the prosecution has the burden of proving beyond a reasonable doubt that the petitioner is ineligible for resentencing. (*Id*., at subd. (d)(3).) The prosecutor and petitioner "may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid.*)

In short, a section 1170.95 petitioner must first make a prima facie case for relief and, if they are able to do so, the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and recall the sentence. (See, e.g., *People v. Verdugo* (2020) 44 Cal.App.5th 320, 328, review granted Mar. 18, 2020, S260493.) "'A prima facie showing is one that is sufficient to support the position of the party in question.'" (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1137, review granted Mar. 18, 2020, S260598, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851.)

15

In this case, the trial court denied defendant's petition at the first stage of prima facie review under section 1170.95, subdivision (c). "A denial at that stage is appropriate only if the record of conviction demonstrates that 'the petitioner is ineligible for relief as a matter of law.' [Citations.] This is a purely legal conclusion, which we review de novo." (*Murillo*, *supra*, 54 Cal.App.5th at p. 167.)

B.     *The Trial Court Properly Denied Defendant's Petition.*

1.     *The proper vehicle to challenge a felony-murder special-circumstance finding is a habeas petition.*

"To be eligible for resentencing under section 1170.95, [a defendant] must show that he 'could not be convicted of first or second degree murder because of changes to Section[s] 188 or 189 made effective' as a part of Senate Bill No. 1437. [Citation.] Under the newly amended version of section 189, a defendant can be convicted of felony murder only if he was the actual killer; acted with the intent to kill in aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting in first degree murder; or 'was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' [Citation.] These are identical to the circumstances in which a felony-murder special circumstance applies. [Citation.] Thus, the jury's special circumstance finding shows as a matter of law that [the defendant] could still be convicted of felony murder under the new definition, and prevents [the defendant] from making a prima facie case that he is eligible for resentencing." (*Murillo*, *supra*, 54 Cal.App.5th at p. 167.)

16

Defendant contends that the jury's true finding on the felony-murder special-circumstance finding does not necessarily show that he is ineligible for relief. Defendant argues that the evidence is insufficient to support a finding that he was a major participant who acted with reckless indifference to human life under *Banks* and *Clark*.

Three recent cases, however, have found that "the proper remedy for challenging a special circumstance finding is by a petition for habeas corpus, not a petition for resentencing under section 1170.95." (*People v. Galvan* (2020) 52 Cal.App.5th 1134, 1137, 1142 (*Galvan*); see *Murillo*, *supra*, 54 Cal.App.5th at pp. 167-168); *People v. Gomez* (2020) 52 Cal.App.5th 1, 17 (*Gomez*).) The *Murillo* court stated: "As we explained in *Galvan*, a defendant subject to a pre-*Banks* and *Clark* special circumstance is ineligible for resentencing under section 1170.95 because of the basis of his claim. Although [the defendant] asserts that he could not now be convicted of murder, 'the alleged inability to obtain such a conviction is not 'because of changes' made by Senate Bill No. 1437, but because of the clarification of the requirements for the special circumstances finding in *Banks* and *Clark*. Nothing about those requirements changed as a result of Senate Bill No. 1437. Just as was the case before that law went into effect, the special circumstance applies to defendants who were major participants in an underlying felony and acted with reckless indifference to human life. If [the defendant] is entitled to relief based on *Banks* and *Clark*, the avenue for such relief is not section 1170.95, but a petition for writ of habeas corpus.'" (*Murillo*, *supra*, 54 Cal.App.5th at p. 168.)

The *Murillo* court went on to state that "[b]y requiring a defendant to seek relief via habeas corpus, we avoid creating a disparity in which similarly situated defendants'

17

cases are evaluated under different standards based solely on the date of their convictions. 'Defendants convicted after the Supreme Court issued its decisions in *Banks* and *Clark* would be required to challenge the sufficiency of the evidence of the special circumstance finding on direct appeal, where the People would need only to show that substantial evidence supported that finding.  If the judgment is affirmed, generally it would be the law of the case in any proceedings thereafter as to those findings. [Citations.]  But where, as here, a defendant was convicted before *Banks* and *Clark*, if the defendant could bring a collateral challenge under section 1170.95, the prosecution would be required to prove the special circumstance beyond a reasonable doubt. [Citation.]  Yet nothing in the language of Senate Bill 1437 suggests that the Legislature intended unequal treatment of such similarly situated defendants.'" (*Murillo*, *supra*, 54 Cal.App.5th at pp. 168-169.)

We agree with *Gomez*, *Galvan*, and *Murillo* and hold that the proper procedure of challenging a felony-murder special-circumstance finding is a habeas petition.[3]

---

[3]  We acknowledge the contrary holdings in *People v. Torres* (2020) 46 Cal.App.5th 1168, review granted June 24, 2020, S262011; *People v. Smith* (2020) 49 Cal.App.5th 85, review granted July 22, 2020, S262835; and *People v. York* (2020) 54 Cal.App.5th 250, which would allow defendants to challenge the validity of murder convictions that predated the *Banks* and *Clark* decisions, by requiring the People to prove, once again, the special circumstances beyond a reasonable doubt.  We simply disagree that the language of section 1170.95 provides defendant an opportunity to relitigate special circumstance findings because of the clarification of the requirements for those findings in *Banks* and *Clark*.

*2.      As a matter of law, the special circumstances, as defined by Banks and Clark, apply to defendant.*

Assuming arguendo that defendant can challenge the validity of a felony-murder special-circumstance finding via a petition under section 1170.95, defendant's claim fails because his record of conviction, as a matter of law, establishes that the jury's special circumstance finding is valid under the standard established by *Banks* and *Clark*.

Whether there is sufficient evidence that defendant was a major participant in the robbery, who acted with reckless indifference to human life, is a question we can decide on appeal. "A [d]efendant's claim that the evidence presented against him failed to support [a] robbery-murder special circumstance [finding made prior to *Banks* and *Clark*] . . . is not a 'routine' claim of insufficient evidence." (*In re Miller* (2017) 14 Cal.App.5th 960, 979-980.) The "claim does not require resolution of disputed facts; the facts are a given." (*Id.* at p. 980.)

Section 190.2 sets forth the special circumstances under which murderers and accomplices can be punished by death or life without possibility of parole. One such circumstance is when a defendant is found guilty of first degree murder committed while he was engaged in, or was an accomplice to, the commission or attempted commission of a robbery. (§ 190.2, subd. (a)(17)(A).) However, as explained *post*, a death resulting during the commission of a robbery (or any other felony enumerated in § 189) is insufficient, on its own, to establish a felony-murder special-circumstance finding for those defendants, like defendant in this case, who were not determined to be the actual killer. Such defendants can only be guilty of special circumstance felony murder if they

19

aid in the murder with the intent to kill (§ 190.2, subd. (c)) or, lacking intent to kill, aid in the felony "with reckless indifference to human life and as a major participant." (§ 190.2, subd. (d).)

Section 190.2, subdivision (d), was enacted in 1990 (Stats. 1989, ch. 1165, § 16) to bring state law into conformity with prevailing Eighth Amendment doctrine, as set out in the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137. (*Banks*, *supra*, 61 Cal.4th at pp. 794, 797.) "In *Tison*, two brothers aided an escape by bringing guns into a prison and arming two murderers, one of whom they knew had killed in the course of a previous escape attempt. After the breakout, one of the brothers flagged down a passing car, and both fully participated in kidnapping and robbing the vehicle's occupants. Both then stood by and watched as those people were killed. The brothers made no attempt to assist the victims before, during, or after the shooting, but instead chose to assist the killers in their continuing criminal endeavors. [Citation.] The Supreme Court held that the brothers could be sentenced to death despite the fact they had not actually committed the killings themselves or intended to kill, stating: '[R]eckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result. [¶] The [brothers'] own personal involvement in the crimes was not minor, but rather, . . . "substantial." Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each . . . was actively involved in every element of the

20

kidnap[p]ing-robbery and was physically present during the entire sequence of criminal activity culminating in the murder[s] . . . and the subsequent flight. The Tisons' high level of participation in these crimes . . . implicates them in the resulting deaths.'" (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393-394, quoting *Tison*, at pp. 157-158.)

"The *Tison* court pointed to the defendant in *Enmund v. Florida* (1982) 458 U.S. 782, . . . (*Enmund*) as an example of a nonkiller convicted of murder under the felony-murder rule for whom the death penalty was unconstitutionally disproportionate. Enmund was the driver of the getaway car in an armed robbery of a dwelling whose occupants were killed by Enmund's accomplices when they resisted. [Citations.] In deciding the Eighth Amendment to the United States Constitution forbids imposition of the death penalty 'on one such as Enmund . . . ,' the high court emphasized that the focus had to be on the culpability of Enmund himself, and not on those who committed the robbery and shot the victims [citation]. 'Enmund himself did not kill or attempt to kill; and, . . . the record . . . does not warrant a finding that Enmund had any intention of participating in or facilitating a murder. . . . [T]hus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims]. This was impermissible under the Eighth Amendment.'" (*In re Ramirez*, *supra*, 32 Cal.App.5th at p. 394.)

In *Banks*, the California Supreme Court described what is often referred to as the *Tison-Enmund* spectrum. "At one extreme" are people like Enmund—"'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.'" (*Banks*, *supra*, 61 Cal.4th at p. 800.) "At the other

21

extreme [are] actual killers and those who attempted or intended to kill." (*Ibid.*) Section 190.2, subdivision (d), covers those people who fall "'into neither of these neat categories'"—people like the Tison brothers, who were major participants in the underlying felony and acted with a reckless indifference to human life. (*Banks*, at p. 800.)

The California Supreme Court articulated several factors intended to aid in determining whether a defendant falls into this middle category, such that section 190.2, subdivision (d), would apply to them. "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or *using* lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant *present at the scene* of the killing, in a position to facilitate or *prevent* the actual murder, and did his or her own actions or *inaction* play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, italics added.) "No[t] one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

The defendant in *Banks*, Lovie Troy Matthews, was convicted of first degree murder with a felony-murder special-circumstance finding based on his having acted as the getaway driver for an armed robbery, which his codefendant Banks and others participated, and in which Banks shot and killed one of the robbery victims while escaping. (*Banks*, *supra*, 61 Cal.4th at pp. 796-797.) Considering the defendant's involvement in the robbery against the factors just enumerated, the court "placed [him] at

22

the *Enmund* pole of the *Tison-Enmund* spectrum." (*In re Ramirez*, *supra*, 32 Cal.App.5th at p. 397.) As a result, the court concluded "the jury's special-circumstance true finding cannot stand." (*Banks*, at p. 811.)

Not long after *Banks*, the court revisited this issue in *Clark*, also concluding the evidence was insufficient to support the defendant's robbery-murder special-circumstance findings. (*Clark*, *supra,* 63 Cal.4th at p. 611.) The defendant in *Clark* *planned* a burglary of a computer store to occur after the store was closed. According to the plan, his codefendant was to carry out the burglary and carry an unloaded gun. However, his codefendant ended up carrying a gun loaded with one bullet and fired that bullet when he unexpectedly encountered a store employee, killing her. (*Id.* at pp. 612-613.) The Supreme Court concluded there was insufficient evidence Clark acted with reckless indifference to human life because (1) Clark was not physically present when his codefendant killed the employee and was therefore unable to intervene; (2) there was no evidence Clark knew his codefendant was predisposed to be violent; and (3) Clark planned for the robbery to take place after the store closed, and the gun was not supposed to be loaded. (*Id.* at pp. 619-622.). In sum, the court believed there was "nothing in [Clark's] plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623.)

In this case, defendant argues that because his trial occurred before *Banks* and *Clark*, his case "at the very least raises a serious factual question as to whether" the elements enumerated therein were proven. He cites to *Banks*, *supra*, 61 Cal.4th 788 and

23

*In re Miller*, *supra*, 14 Cal.App.5th 960 for support.  Neither case aids defendant in his argument.

As noted *ante*, in *Banks*, what the court found significant was the defendant's role as the getaway driver, who was not aware his codefendants were going to use guns during the robbery.  Because the defendant "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance," the court concluded he was not "willingly involved in the violent manner in which the particular offense [was] committed."  (*Banks*, *supra*, 61 Cal.4th at pp. 801, 807; see *id*. at p. 803, fn. 5.)

In *In re Miller*, *supra*, 14 Cal.App.5th 960, the defendant and his cohorts planned one of their usual "'follow-home'" robberies.  A "'spotter'" would go to a bank and find a person withdrawing a large sum of money, the "'driver'" would follow that person to his or her destination and the "'getter'" would confront the person and take the money.  (*Id*. at p. 964.)  They sometimes used guns, but not always.  (*Id.* at p. 965.)  In the charged incident, the defendant was the spotter and told his cohorts to follow the victims.  Thereafter, one of the cohorts ended up fatally shooting one of the victims.  The robbers went back to the defendant's house to divide up the money.  (*Id.* at pp. 964-965.)  The court held that there was insufficient evidence to support the felony-murder special-circumstance finding because the defendant did not know that a shooting would occur, was not present for the shooting, and could not prevent it.  There was nothing to show that the defendant knew that the risk of human life involved in this robbery was greater than the risk involved in the usual armed robbery.  (*Id.* at pp. 966-967, 974-977.)

24

Here, the jury found defendant guilty of first degree murder with robbery and burglary felony-murder special circumstances, first degree robbery, and first degree burglary.[4] (*Owens et al.*, *supra*, E033148.) As the People both in the proceedings below and on appeal argue, the jury's verdicts and special findings required that the court conclude that, although defendant was not the actual killer, he, at minimum, was a major participant in the underlying felony and acted with reckless indifference to human life. Such a finding, under current law, would render defendant ineligible for relief pursuant to section 1170.95.[5] (§ 189, subd. (e)(2), (e)(3); *Verdugo*, *supra*, 44 Cal.App.5th at p. 326.)

Here, defendant's actions satisfied many of the factors announced in *Banks* and *Clark*. Defendant was involved with Session and Walton in the planning of the burglary and robbery. Defendant was the only one who had been to the apartment before; he told his codefendants who would be present at the apartment when the burglary and robbery

---

[4] In the opinion from the original judgment, this court noted: "The verdicts for the robbery special circumstance findings, as read to the jury, signed by the foreperson, read in court, and filed by the clerk, were not properly stated, because the verdict forms were not in the correct form. The verdicts stated: 'We, the jury in the above entitled action, further find the defendant, [name of defendant], while the defendant were [*sic*] engaged in the commission of, attempted commission of, and the immediate flight after committing and attempting to commit the crime of Robbery in violation of Penal Code section 211/212.5, within the meaning of Penal Code section 190.2, subdivision (a), subsection (17)(A).' The verdicts should have included the words 'murder of Russell Wilson was committed by' between the words 'the' and 'defendant' the first time those words appeared. The mistake has no consequence, since both the robbery and the burglary special circumstance allegations were found true, and only one special circumstance finding is necessary to mandate a sentence of life without parole. (*People v. Odle* (1988) 45 Cal.3d 386, 409.)" (*Owens et al.*, *supra*, E033148.)

[5] At oral argument, defendant's counsel conceded that defendant was a "major participant" even within the clarified definition of those terms by *Banks* and *Clark*. Thus, defendant challenges only the "reckless indifference" element of the crime.

they planned would take place. Defendant directed Session and Walton how to get to the apartment. Defendant provided the gun. He went outside the apartment to talk with Session with whom he then reentered the apartment after saying, "[L]ets [*sic*] go up in here and get my money."

Defendant told Session he was going to stay in the living room to make sure the individuals therein did not go anywhere while Session went into the bedroom. Although defendant was not in the room where Session killed the victim, he remained in the same apartment where the murder took place; either before or after the shot, defendant told the others in the apartment not to "trip," and that he and his companions were just there to collect a debt. Defendant stole property from the apartment. He left the apartment together with Session and Walton. Therefore, defendant's conduct "qualified as a major participant who acted with reckless indifference to human life under *Banks* and *Clark* . . . ." (*Law*, *supra*, 48 Cal.App.5th at p. 825.) "As a result, we conclude the denial of [the defendant's] petition was proper." (*Ibid*.)

As the court in *Murillo* recognized, "[i]n *People v. Smith* (2020) 49 Cal.App.5th 85, 95-96 . . . , our colleagues in Division 5 of [the Second District] held that a defendant could challenge a pre-*Banks* and *Clark* special circumstance finding in a petition under section 1170.95. The court also held that it was inappropriate to determine at the first stage of review under section 1170.95 whether the defendant met the standard for a special circumstance under *Banks* and *Clark* because at the final eligibility hearing, a petitioner has the opportunity to introduce new or additional evidence regarding his eligibility for resentencing. [Citation.] The court in *Smith* held that, because a trial court

26

cannot know what evidence a petitioner may submit, it cannot at the first stage of review determine that a petitioner was a major participant who acted with reckless indifference to human life." (*Murillo*, *supra*, 54 Cal.App.5th at p. 173.)

We agree with *Murillo* "that a petition under section 1170.95 cannot be used to challenge a felony-murder special-circumstance finding. Even if we assume that such a challenge can be asserted in a section 1170.95 petition, we disagree with *Smith* regarding the standard for evaluating the evidence to determine whether a defendant has made a prima facie showing of eligibility under that section. If as a matter of law the record of conviction shows, as it does here and did in *Smith*, that the defendant was a major participant who acted with reckless indifference to human life, and the defendant does not claim he has new evidence to present, he has not made a prima facie case. This view is consistent with existing case law construing section 1170.95, including *Lewis*, *supra*, 43 Cal.App.5th 1128, review granted March 18, 2020, S260598 and *Verdugo*, *supra*, 44 Cal.App.5th 320, review granted March 18, 2020, S260493." (*Murillo*, *supra*, 54 Cal.App.5th at p. 173.)

Here, like the record in *Murillo*, "the record of conviction establishes as a matter of law that [the defendant] was a major participant who acted with reckless indifference to human life, as those terms were clarified in *Banks* and *Clark*, and [he] does not claim to have any new evidence on this issue. Therefore, even if his claim [were] cognizable under section 1170.95, [the defendant] was not eligible for relief under that statute." (*Murillo*, *supra*, 54 Cal.App.5th at p. 173.)

27

*C.      Any Error in Denying Defendant's Request to Have His Counsel File a*

*Reply Brief Was Harmless.*

Defendant also argues that the trial court prejudicially erred when it violated his constitutional right to due process by summarily denying his petition without giving counsel an opportunity to file a reply.[6] We need not address this issue because even if it were error for the trial court, the error was harmless beyond a reasonable doubt.[7] First, as noted *ante*, the proper procedure for challenging a felony-murder special-circumstance finding is via a habeas petition. Moreover, even if defendant could challenge the validity of his conviction by means of a section 1170.95 petition, given the trial evidence, counsel

---

[6] To the extent the People suggest defendant forfeited the issue since his "claim of prejudice is speculative, because counsel did not raise this issue at the hearing nor did he indicate he needed to brief it," we disagree. The court did not offer defense counsel any opportunity to raise the issue or request the opportunity to brief it. (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1101 [parties not required to raise issue below if the court failed to give them any meaningful opportunity to object].) Instead, the court itself introduced an objection for the record on behalf of defense counsel.

[7] Defendant also argues that had he been able to raise the factual misstatements present in the People's response in a reply, the court "may very well have found that the allegations in the petition sufficiently stated a prima facie case, such that an OSC had to be issued. In such a situation, there is at least a reasonable chance that [defendant] would have succeeded in obtaining relief after a full hearing in the superior court." However, as the People point out, this was not the basis for the court's denial of defendant's petition. Rather, the court denied defendant's petition because by virtue of the jury's verdicts and special circumstance findings, it had necessarily found defendant aided and abetted the murder with the specific intent to kill and/or acted with reckless disregard to human life as a major participant in the killing. Moreover, the only factual misstatement to which defendant points is that the People stated that defendant, rather than Walton, was the individual in the bedroom with Session when he killed the victim. We observe that defendant had already informed the court in his petition that he never entered the bedroom in which the victim was killed. Furthermore, we will not make the same mistake as the trial court in determining whether the errors were harmless.

28

would not have been able to demonstrate in a reply brief, or otherwise, that defendant was not a major participant who acted with reckless indifference to human life.

## III.  DISPOSITION

The order denying defendant's section 1170.95 petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                        Acting P. J.

I concur:


FIELDS
                J.


29

[*People v. Owens*, E072711]

MENETREZ, J., Concurring.

I concur in the majority opinion except for parts B.2 and C of the Discussion. For the reasons set forth in my concurring opinion in *People v. Jones* (Oct. 23, 2020, E072961) __ Cal.App.5th __ [2020 Cal.App. Lexis 1003], I agree that a petition under Penal Code section 1170.95 is not a proper procedural vehicle for challenging a murder conviction by attacking a prior special circumstance finding. I therefore agree that the trial court correctly denied the petition and that any error in not allowing defendant to file a reply was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

If defendant wishes to attack his special circumstance finding under *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, he remains free to do so by means of a petition for writ of habeas corpus. I do not join part B.2 (or part C, which is partially based on part B.2) of the majority opinion's Discussion because, in my view, it prejudges such a habeas petition.

MENETREZ         
J.

1